[No. 28159.  *En Banc.*  July 17, 1941.]

ELIZABETH H. HANLEY, *Appellant,* v. JOE E. MOST *et al.,*
*Respondents.*[1]

[1]Reported in 115 P. (2d) 933.

430

432

*Preston, Thorgrimson & Turner* and *Colvin & Rhodes,* for appellant.

*McMicken, Rupp & Schweppe* and *J. Gordon Gose,* for respondents Joe E. Most *et al.*

*E. B. Hanley, Jr.,* and *Padden & Moriarty,* for respondent E. B. Hanley, Sr.

STEINERT, J.—Plaintiff, Elizabeth H. Hanley, brought this action seeking (1) to enjoin her husband, defendant E. B. Hanley, Sr., from giving away, or otherwise disposing of, any of the property of their marital

community, and to enjoin the other individual defendants, Joe E. Most, E. G. Most, and A. C. Bevan, from inducing defendant husband to commit any of such acts; (2) to set aside two voting trust agreements wherein defendant husband empowered defendant Joe E. Most, as trustee, to receive, hold, and vote certain capital stock of defendant corporations, The Copper River Packing Company and Pleasant Creek Mining Company, which stock was alleged to belong to the marital community; (3) to compel defendants Joe E. Most and A. C. Bevan to account for and return certain personal property alleged to have been unlawfully procured by them from defendant husband; and (4) to secure the appointment of a receiver for the liquid assets of the marital community.

Upon filing her complaint, plaintiff obtained an order temporarily restraining the disposition by defendant E. B. Hanley, Sr., and the acceptance by the other individual defendants, of any of the assets of the marital community, and also temporarily restraining the defendants from further exercising or recognizing any power under the voting trust agreements.

All of the defendants, with the exception of A. C. Bevan, were duly served, and appeared in the action. By stipulation of the parties appearing, the temporary restraining order was continued and converted into a temporary injunction as to defendants E. B. Hanley, Sr., and Joe E. Most, to remain in force until further order of the court.

The cause came on duly for trial before the court, without a jury, and at the conclusion thereof the court filed a memorandum decision in favor of defendants, and, in conformity therewith, entered a decree dismissing the action and dissolving the temporary restraining order and injunction.

Plaintiff appealed from the entire decree, and gave

bond to supersede so much of the decree as dissolved certain portions of the injunctive order relating to the disposition, by defendant E. B. Hanley, Sr., and to the acceptance, by defendant Joe E. Most, of any of the assets of the marital community.

After the appeal had been perfected, and shortly before the first argument thereon was had in this court on January 22, 1941, defendant E. B. Hanley, Sr., filed herein, *in propria persona,* a lengthy instrument entitled, and purporting to be, a "confession on appeal" by *him.* Thereupon, counsel who had formerly represented all of the defendants except A. C. Bevan withdrew their appearance for E. B. Hanley, Sr., in this court, and other counsel were substituted as his attorneys of record. Joe E. Most, through the attorneys who had formerly represented all the defendants appearing, including both himself and E. B. Hanley, Sr., then moved to strike the confession on appeal, upon two grounds. Although the confession was argued in connection with the merits of the case on appeal, the motion to strike was not formally argued until the regular motion day following the hearing of the case on its merits.

Shortly after E. B. Hanley, Sr., had filed his confession on appeal, appellant, Elizabeth H. Hanley, applied for, and obtained from this court, an order directing respondents Joe E. Most and E. B. Hanley, Sr., to show cause why an order should not be entered commanding them forthwith to dissolve and cancel two contracts for the sale of certain capital stock in the respondent corporations, which contracts had been entered into by and between E. B. Hanley, Sr., and Joe E. Most after this appeal had been taken, and further directing respondent Joe E. Most to show cause why he should not be punished for contempt of *this* court because of his violation of the injunctive orders

issued by the trial court upon the commencement of the action.

In response to the show cause order, E. B. Hanley, Sr., filed an answer, *in propria persona,* expressing his willingness to cancel those contracts and to execute any documents which this court might direct to that end. At the argument, he was represented by his substituted attorneys of record. Respondent Joe E. Most, by additional counsel, and in response to the show cause order, filed an affidavit alleging that the execution of the two contracts just mentioned was not in violation of the injunctive orders, and that the sale and purchase of the capital stock covered by those contracts were for valid consideration and were in all respects regular. The contempt matter was argued at the same time that argument was had on the motion to strike E. B. Hanley, Sr.'s, confession on appeal, but was assigned for a separate opinion.

Thereafter, this court called for a rehearing of all matters involved in the controversy, and on May 27, 1941, argument was had, before the court sitting *En Banc,* upon all the various issues which had theretofore been presented. This opinion does not dispose of the contempt proceedings, but is confined to the matter of the appeal taken from the decree of the trial court, and to the matter of the subsequent "confession on appeal" by E. B. Hanley, Sr.

The theory of appellant's complaint was that, as a result of a conspiracy on the part of respondents Most and defendant Bevan, respondent E. B. Hanley, Sr., by reason of his advanced age, his alleged impaired physical and mental condition brought about by serious illness, and by reason of the absolute trust and confidence reposed by him in respondent Joe E. Most, was inveigled and induced by respondents Most and defendant Bevan to do the following things: (1) To

make numerous and sundry gifts of money and other personal property of the marital community to defendant Bevan; and (2) to give and transfer to respondent Joe E. Most, through the device of two voting trust agreements, large blocks of stock of the two corporate defendants, thereby enabling Most to secure complete control over the affairs of the two corporations.

It was alleged that the voting trust agreements were executed secretly, fraudulently, and without the knowledge or consent of appellant or of appellant's daughter, both of whom were stockholders in one of the two corporations; that such voting trust agreements were never filed in the offices of the respective corporations, but were kept secret until recently discovered by appellant; that respondents had deliberately withheld from appellant all knowledge of the affairs of the corporations; that respondent Joe E. Most, by reason of his influence over E. B. Hanley, Sr., had obtained possession and control over other properties and securities belonging to the marital community, the kind and nature of which were alleged to be unknown to appellant; that, for several years last past, respondent Joe E. Most had manifested a strong dislike for appellant, and had maintained an attitude of hostility toward her; that her interests and those of the community were jeopardized by the existing voting trust agreements; that, as the result of such fraudulent acts, appellant and the marital community had been prevented from exercising their rights with respect to the corporations mentioned, and had sustained serious detriment and injury; that respondent E. B. Hanley, Sr., being under the complete control of respondent Joe E. Most, had, in defiance of appellant's request, refused to cancel the voting trust agreements; and that respondent E. B. Hanley, Sr., acting under the influence of the parties

charged with the conspiracy, would, unless prevented, dissipate the remaining assets of the marital community.

The evidence in the case covers a period of nearly forty years. The events which precipitated this lawsuit, however, are of comparatively recent origin. While there was considerable conflict in the testimony, we outline the facts here involved according to our determination of the weight of the evidence.

At the time of the commencement of the action, in June, 1939, respondent E. B. Hanley, Sr., was seventy-six years of age, appellant, Elizabeth H. Hanley, was approximately twenty years younger, and respondent Joe E. Most had arrived at the age of forty-six years. The Hanleys were married in 1903, and have been husband and wife ever since. They have a son, E. B. Hanley, Jr., who is a practicing attorney in the city of Seattle, and a daughter, Katheryn Heffernan. We will, from this point on, refer to respondent E. B. Hanley, Sr., simply as Mr. Hanley, or E. B. Hanley; to his son as E. B. Hanley, Jr.; and to respondent Joe E. Most as Mr. Most, or Joe Most.

Since early manhood, Mr. Hanley has been engaged in a series of business enterprises and ventures such as cattle raising in Oregon, prior to his marriage, and, subsequently, freighting, mining, fishing, and fish-packing in Alaska, as well as mining elsewhere. Some of his ventures have resulted in losses, but for the most part he has been remarkably successful, so much so that, at the time of the present action, he had amassed a fortune conceded to be well over a half million dollars, the greater part of which was represented by a controlling interest in respondent The Copper River Packing Company, which operates a fish cannery in Alaska, and a near-controlling interest in respondent Pleasant Creek Mining Company, which

operates a gold mine in Oregon. He was also possessed of, or had a large interest in, a considerable number of gilt-edge securities.

For more than twenty-five years, Mr. Hanley's primary interest has been in The Copper River Packing Company and its fishing and fish-packing business. The assets of that company include a substantial amount of valuable stocks and bonds. The net worth of the company is about eight hundred eighty thousand dollars. The record attests the fact that Mr. Hanley has been a shrewd, sound, capable, experienced, and successful businessman. Appellant herself states that such was the case until some time in 1937 when, as alleged by her, Mr. Hanley, on account of physical and mental infirmity, became a prey to the influence of his corespondents, particularly Joe Most.

All of the property herein referred to is conceded to be community property.

The Copper River Packing Company, whose operation, affairs, and present financial condition figure most prominently in this controversy, was organized, as nearly as we can determine, in 1915 or 1916, by Mr. Hanley and one Frank Madden, each of whom held a one-half interest in the total capital stock of fifty thousand dollars. At first, they operated a cannery at Abercrombie, on Prince William Sound in Alaska. Shortly thereafter, Mr. Hanley, acting for the company, built another cannery, known as the Nellie Juan, at another point on the sound. At the same time, respondent Joe Most, who had been engaged in the salmon-packing business since 1909, became foreman at the Abercrombie plant. In 1918, he was made superintendent, and acted in that capacity until the spring of 1922, at which time he and Mr. Hanley purchased Mr. Madden's one-half interest in the corporation. Mr. Most paid ten thousand dollars for the one-fourth in-

terest purchased by him. Mr. Hanley, or rather the marital community, by purchasing the balance of Madden's interest, became, and ever since has been, the owner of a three-fourths interest in the packing company.

At the time that Joe Most bought into the corporation, in 1922, the company was none too prosperous, and Mr. Madden had been very desirous of disposing of his interest therein. By 1928, however, the company had built up an enormous surplus, and in consequence thereof its capitalization was increased to $999,900, divided into 9,999 shares, each having a par value of one hundred dollars. The increase of stock, which was issued against the company's surplus, was divided between Mr. Hanley and Mr. Most in the proportion of their former holdings. At the time of the commencement of this action, Mrs. Hanley, who was a director in the company, held one qualifying share, Mrs. Heffernan, the daughter, held thirteen hundred shares, which had been given to her by the family, and Mr. Hanley himself held the remainder of the Hanley-owned stock in that company. Mr. Hanley, who was the president of the corporation, received an annual salary of twenty thousand dollars, and Mr. Most, who was secretary, received twelve thousand five hundred dollars. Both men have devoted their constant attention and effort to the operation of the Nellie Juan cannery, which, apparently, is the only cannery now owned by the corporation.

The evidence discloses that, during the eighteen years of their association, the relationship between Mr. Hanley and Mr. Most has been a completely harmonious one, and has been marked by mutual confidence, loyalty, and respect. Although their legal status was merely that of fellow stockholders so far as the packing company was concerned, the relationship be-

tween them, from the practical standpoint, more nearly resembled that of partners. Together, they have not only managed The Copper River Packing Company, and personally labored in its operations during all this period of time, but have also engaged in other ventures. Frequently, one of them in the absence of the other would invest a considerable sum of money, and when the other returned he would immediately assume his share of the investment without question. They often discussed new business ventures, and from time to time they embarked upon them. Whether a particular venture proved a success or a failure, neither of them claimed the credit for its proposal, or criticized the other because of an unfortunate result. In all these years there has never been a dispute between them. The growth and success of the packing company has been due directly to the efficient management and the arduous labors by the two men. There has also been a degree of social contact between the Hanley and the Most families which, although not particularly intimate, nevertheless appears to have been mutually amicable until about the year 1938.

During the latter part of 1937 or the early part of 1938, Mr. Hanley and Mr. Most became interested, with two other individuals, in a placer mining venture in southern Oregon. In 1939, they created Pleasant Creek Mining Company, a corporation, one of the respondents herein, with a capital stock of five hundred shares of the par value of one dollar each. Mr. Hanley and Mr. Most each took 181¼ shares, thereby acquiring joint control of the company. The investment of each of the two men in that company now amounts to approximately thirty-seven thousand dollars. The corporation has assets of over one hundred thousand dollars, and is actively engaged in operating the mine. It is regarded as a profitable enterprise.

In recent years, particularly since about the middle of 1937, Mr. Hanley's health has been failing. For some time before that, realizing that he was getting along in years and that he could not continue indefinitely to discharge the onerous duties incumbent upon him in the operation of the fish-packing company, he had delegated increasing authority to Mr. Most, who was in his prime, and who was thoroughly competent to manage and conduct the business. During the fishing season of 1937, Mr. Hanley, while at the Nellie Juan cannery, was stricken with a severe illness, and his daughter, Mrs. Heffernan, brought him to Seattle for hospitalization. Mrs. Hanley was at that time in Europe on a five-month trip. Although Mr. Hanley recovered from that particular attack of illness, he has not since enjoyed entirely good health.

In the latter part of 1937 or the early part of 1938, Mr. Hanley went to Los Angeles with Mr. Most, at the latter's suggestion, to consult a specialist on prostatic diseases. An examination of Mr. Hanley was made by the specialist, and medical advice was given, but no operation was performed. Returning from Los Angeles, Mr. Hanley and Mr. Most stopped on their way at Medford, Oregon, and, probably at that time, concluded their arrangements for going into the gold mining venture.

Unfortunately, as appears from the record, a long period of tranquil married life, and certainly of a successful business career, was marred by domestic troubles between Mr. and Mrs. Hanley, beginning about the year 1937. From the standpoint of appellant at least, there seem to have been two causes of their marital difficulties. One was the fact that Mrs. Hanley unexpectedly came into possession of certain letters which indicated a friendship existing between Mr. Hanley and defendant A. C. Bevan, a middle-aged

woman, who resided with her minor daughter in Medford, Oregon. Mrs. Bevan was employed at a cigar stand in a hotel in that city.

The evidence discloses that, over a course of several years, Mr. Hanley, while stopping at that hotel, had occasionally given her small sums of money, and at Christmas times had remembered her with a box of candy or some similar gift. There is in the record a series of letters from her to him, covering a period of several years. In one of the letters, Mrs. Bevan requested a loan of a few hundred dollars from Mr. Hanley, but it is clear from the evidence that the request was never granted. While it is alleged in the complaint that the gifts to Mrs. Bevan were procured from Mr. Hanley through a conspiracy on the part of the individual respondents and the defendant Bevan, it is evident from the record that neither Joe Most nor E. G. Most had anything whatever to do with those matters, and that neither of them was in any way connected with the alleged friendship existing between Mr. Hanley and Mrs. Bevan.

The other cause of marital difficulty between Mr. and Mrs. Hanley seemingly was the fact that Mr. Hanley, in recent years, particularly when his health began to fail, came to rely more and more upon Joe Most in the conduct and management of the Nellie Juan cannery and the other ventures in which they were engaged or engaging, particularly the gold mining venture in Oregon. The friendship between the two men had steadily grown and had become firmly cemented, and, as already stated, each had utmost confidence in the ability and integrity of the other. Mr. Hanley, however, because of his increasing age and failing health, was no longer able to give his business interests the care and attention which he had formerly devoted to them. He was also apprehensive

as to what might occur in the event that he became even less able to function therein, particularly if Mr. Most, who was a minority stockholder in The Copper River Packing Company, should decide to sever his connection with that company and go into business for himself.

According to Mr. Hanley's testimony, he felt that he could not expect much help from any of the members of his own family, because they were not conversant with the businesses or enterprises in which he and Mr. Most were associated. His idea was that his interests, as well as those of his family, would be best conserved if Mr. Most were allowed, in time, not only to assume complete management of the two corporations, but also to dictate their policies in the future. To that end, he discussed the matter with Mr. Most on several occasions, over a period of two or three years, but no definite arrangement was made until shortly before this action was commenced.

In January, 1938, at the instance of Mr. Hanley, respondent E. G. Most, brother of Joe E. Most, was employed as superintendent of the cannery at a salary of six thousand dollars per year. E. G. Most was an experienced cannery man, and the reason for employing him was that he might do the work at the cannery that Mr. Hanley had formerly been doing. From that time forward, the active operations of the cannery business were conducted by the Most brothers. Mr. Hanley, however, continued his hold upon the business, and, despite his failing health, gave it his constant attention. His mind remained clear, and his will power was not diminished.

In the meantime, Mrs. Hanley and her son and daughter became aware of the fact that Joe Most was taking on more of the responsibilities of the business, and was exercising a greater voice in its affairs than

he formerly had. They also noted the fact that the personal relationship between Mr. Hanley and Joe Most was even more close than formerly. This caused them considerable apprehension, and, as between Mr. and Mrs. Hanley, provoked some verbal altercations. Mrs. Hanley appeared to resent Mr. Hanley's implicit confidence in Joe Most, and feared that the latter would take advantage of her husband in business matters. She particularly resented the fact that Mr. Most, without the family's knowledge or consent, had taken Mr. Hanley to Los Angeles for medical attention in 1938, and the further fact that Mr. Hanley and Mr. Most were contemplating the gold mining venture in Oregon.

Matters did not stop with altercations between Mr. and Mrs. Hanley. On a number of occasions, Mrs. Hanley made known her views to Joe Most, and he, in turn, seems to have retorted in kind. Mr. Hanley, however, was uniformly insistent that the family be careful of their treatment of Mr. Most, and when informed of the various verbal episodes became quite angry. Upon several occasions, he threatened to get a divorce, and always took the position that Joe Most's conduct of the business met with his full approval. The relationship between Mr. and Mrs. Hanley became further strained by reason of occasional references to Mrs. Bevan and the letters that she had previously written to Mr. Hanley. The period between 1937 and the early part of 1939 was not only one of hostility between Mrs. Hanley and Joe Most, but was also, for a great part of the time, one of unhappiness between Mr. and Mrs. Hanley. In addition, Mr. Hanley sustained several attacks of illness during that period, and upon a number of occasions was confined in a hospital for several weeks.

It may be stated, in passing, that Mr. Hanley had

always generously provided for his family, and there is no claim to the contrary. In fact, the record shows that, during the period when this lawsuit was pending, he made a present of four thousand dollars to his daughter, Mrs. Heffernan, and a present of one thousand dollars to her son Bobbie. Technically, those gifts were in violation of the existing restraining order, but no complaint of that is made by Mrs. Hanley. It may also be stated that, up until 1939, E. B. Hanley, Jr., had attended to the legal affairs of the two corporations. Both he and his sister were devoted to their father, but were also loyal to their mother, and it was through the son and daughter that Mrs. Hanley obtained at least a part of the information that led to her altercations with Mr. Hanley.

We come now to the event which precipitated this lawsuit. In the early part of 1939, Mr. Hanley had come to the conclusion that some definite action should be taken by him to carry out his intended plan of turning over to Joe Most the active management of The Copper River Packing Company. He broached the matter to Mr. Most, and, after some discussion between them, they decided to consult an attorney and secure from him advice as to the best method of accomplishing the desired result. At Mr. Hanley's suggestion, they, on or about April 1, 1939, called on Mr. Otto B. Rupp, a lawyer whose offices were in the same building wherein the office of The Copper River Packing Company was located in Seattle. Neither Mr. Rupp nor the firm of which he was a member had ever before represented either Mr. Hanley or Mr. Most.

Mr. Hanley explained the situation to Mr. Rupp, and stated that he wished to perfect some arrangement whereby Mr. Most would be placed in charge of the affairs of both The Copper River Packing Company and Pleasant Creek Mining Company, and be put in

position to shape the policies of the two companies. He gave as his reason the facts that he was becoming too old to continue active in the businesses, that he did not feel that his family would be able to conduct the enterprises in an efficient manner, and that Mr. Most, because of his long connection with both companies, which were engaged in rather hazardous ventures, was best qualified to handle the entire situation. The matter was discussed wholly from a business standpoint, and no mention was made to Mr. Rupp of any of Mr. Hanley's domestic difficulties.

Early in the discussion, the question of voting trust agreements was suggested and considered, and that plan was ultimately adopted. Two instruments were accordingly prepared, one as to The Copper River Packing Company, and one as to Pleasant Creek Mining Company, in conformity with the provisions of Rem. Rev. Stat. (Sup.), § 3803-29 [P. C. § 4592-59] (Laws of 1933, p. 792, § 29), which statute provides that two or more shareholders may join in such agreement. There was some question, however, in the mind of Mr. Rupp, as to whether or not Joe Most could legally transfer his own stock to himself as trustee. To obviate any legal difficulty on that score, Joe Most, at Mr. Rupp's suggestion, made an outright gift of one of his shares of stock in each corporation to his brother, respondent E. G. Most.

The voting trust agreements, as prepared, ran between Mr. Hanley and E. G. Most, as shareholders, and Joe Most, as trustee, and were executed on May 4, 1939. The agreement with reference to The Copper River Packing Company evidenced the fact that Mr. Hanley had transferred two thousand five hundred ten shares of stock of that company to Joe Most, as trustee, and that E. G. Most had in like manner transferred his one share. The agreement with reference to

Pleasant Creek Mining Company stated that Mr. Hanley had transferred seventy-four shares of stock of that company to Joe Most, as trustee, and that E. G. Most had likewise transferred his one share of stock.

Both agreements provided that voting trust certificates should be issued in place of the stock certificates, and that holders of such voting trust certificates should be entitled to receive the dividends on the stock transferred by them. The agreements further provided that Joe Most should have the right to vote all shares of stock held by him under the terms of the instruments. Finally, it was provided therein that the agreements should terminate at the expiration of ten years from date thereof unless Joe Most should within that time die, become mentally disqualified, or should be unwilling to continue as such trustee, in any of which cases the trusts would terminate at such earlier time.

It will be noted, at this point, that, although Mr. Hanley did not transfer all of his stock in either corporation to Joe Most, as trustee, the amounts which he did transfer, taken in conjunction with Joe Most's own stockholdings, were sufficient to give Mr. Most voting control of both corporations. It may also be said, at this time, that the evidence does not in the slightest degree indicate that defendant A. C. Bevan had anything to do with the voting trust agreements or with any of the plans leading up to their execution.

Mr. Hanley did not inform his wife or children of the execution of the voting trust agreements. E. B. Hanley, Jr., however, appears to have gotten some information by "grapevine," as he termed it, to the effect that his father had "sold out" the cannery business. Immediately upon the execution of the two agreements, Joe Most had left for Alaska. On his way, he wrote a letter to Mr. Hanley, making some refer-

ence to the voting trusts. The letter was forwarded to Medford, Oregon, whither Mr. Hanley had gone, in company with his daughter, Mrs. Heffernan, for the purpose of visiting the mining operations. Mrs. Heffernan found and read the letter from Mr. Most, and promptly communicated its contents to her brother, E. B. Hanley, Jr., who, in turn, passed the information along to Mrs. Hanley.

On Mr. Hanley's return to Seattle, a family council was held, and, on the next day, the four members of the family repaired to the company's office, where E. B. Hanley, Jr., was shown, and he there read, the voting trust agreements. Mr. Hanley was thereupon advised by his son that the practical effect of the agreements was that he had *given* his property to Joe Most. Mr. Hanley vehemently denied that such was the fact. At any rate, a telegram was sent to Mr. Most, at E. B. Hanley, Jr.'s, insistence, suggesting that Joe Most cancel the voting trust agreements. Mr. Most replied by wire, and said that he would come to Seattle at once to discuss the matter. Upon his arrival in Seattle, a conference was held on June 2, 1939, between Mr. Most, Mr. Hanley, and the other three members of his family. E. B. Hanley, Jr., insisted that Joe Most resign as trustee at once; Mr. Most declined to do so; and Mr. Hanley took no positive stand, but apparently leaned to the side of Mr. Most. After the conference was over, and on the same day, the complaint herein was served on Joe Most. It was later served on the other respondents.

At the time of the trial of the action, in April, 1940, the breach between Mr. and Mrs. Hanley had widened to such an extent that Mr. Hanley was no longer living at the family home. The trial lasted a week, and resulted in a voluminous record. Throughout the case, Mr. Hanley maintained the position that he had volun-

tarily and with forethought entered into the voting trust agreements because he considered that they were to the best interests of himself and his family. As stated by the trial court in an extensive memorandum decision rendered a few days after the trial,

"He [Mr. Hanley] testified that his purpose in executing the voting trust agreements was to 'protect the family'; that it was his own idea, not Mr. Most's; and that he fully understood the import of the documents."

In its memorandum decision, however, the trial court further indicated that the voting trust agreements were affected with "a testamentary tinge" which would probably subject them to termination upon the death of Mr. Hanley prior to the ten-year maximum period provided therein. This suggestion by the court seems to have occasioned Mr. Most some apprehension, for the obvious reason that, if the agreements were terminated, and if Mr. Hanley should die, it would leave Mr. Most as a minority stockholder, subject to stock control by the Hanley family.

Accordingly, on May 3, 1940, which was before the trial court had entered the final decree herein, Mr. Most wrote a letter to Mr. Hanley in which he made an offer to purchase from Mr. Hanley (a) two thousand five hundred ten shares of stock in The Copper River Packing Company (which stock was part of 3,688¼ shares held by Mr. Hanley, over and above the shares included in the voting trust agreement) for one hundred thirty thousand dollars, payable thirteen thousand dollars in cash and the balance in installments of a like amount, and (b) all of Mr. Hanley's interest in Pleasant Creek Mining Company for fifty-six thousand five hundred dollars, practically all of which latter amount was to be payable out of the mining operations. After the decree by the trial court had been entered, Mr. Hanley and Mr. Most, on May 15,

1940, entered into two contracts of sale embodying the terms of the foregoing offer by Mr. Most. Mrs. Hanley did not learn of those contracts until Mr. Hanley filed his confession on appeal herein on December 27, 1940. The contempt proceeding above mentioned, instituted in this court, is based upon the execution of those contracts.

Until December 27, 1940, this case, so far as court proceedings were concerned, had every appearance of being a straight lawsuit waged by Mrs. Hanley principally against her husband, E. B. Hanley, and Joe E. Most. On that day, which was shortly before the argument on appeal, however, a rather remarkable thing occurred. Mr. Hanley filed in this court, *in propria persona,* his confession on appeal, consisting of twenty typewritten pages, in which he asked: (1) That the judgment in favor of *respondents,* including himself, be reversed; (2) that respondent Joe Most be removed as trustee under the two voting trust agreements; (3) that the court approve certain action taken by Mr. Hanley on *December 7, 1940,* in which he had attempted to revoke and cancel the voting trust agreements; and (4) that the court approve the action taken by him, Mr. Hanley, on the same day, to rescind the two contracts made between him and Joe Most on May 15, 1940, following the entry of the decree by the trial court.

. The confession, which goes into great detail, contains, in substance, the following allegations by Mr. Hanley: That, when he executed the two voting trust agreements, he sincerely, but unwisely, believed in the integrity of Joe Most; that his confidence in Joe Most had been misplaced; that Joe Most prevailed upon him to execute the two contracts of sale of stock on May 15, 1940, through misrepresentation, and in violation of the restraining order of the court then in

force; that he did not discover the effect of those contracts until some time after November 5, 1940; that the contracts contained unconscionable provisions, set forth in the confession, the effects of which, it is alleged, were not understood by Mr. Hanley at the time that he executed them; that the price which Joe Most therein agreed to pay for the stock was wholly inadequate, and amounted to taking Mr. Hanley's stock away from him without consideration; that, when the matter was brought to Mr. Hanley's attention in November, 1940, he instituted an independent investigation, and then for the first time learned the true import and effect of the voting trust agreements and the subsequent contracts; that he thereupon importuned Joe Most to terminate the voting trusts, but that Most declined to do so; that Mr. Hanley had since done all things in his power to revoke such voting trust agreements and the contracts of sale, and to regain his property covered thereby; wherefore he prayed that this court restore his property, and give to *appellant* and to *himself* their just dues.

From what has been said with respect to Mr. Hanley's confession on appeal, it is apparent that, for one reason or another, his attitude toward Joe Most and toward this entire litigation has radically changed since the entry of the decree by the trial court. The papers filed in this court subsequent to the appeal indicate that Mr. Hanley is now living at home with his family, and that he is confined to his bed with illness.

In our discussion of the questions presented, we take up first the motion to strike E. B. Hanley's confession on appeal.

A general statement of what the various courts of this country have held upon the question of confession of error, on appeal, appears in 5 C. J. S. 1376, § 1887, as follows:

"A judgment will ordinarily be reversed on a confession of error by appellee, respondent, or defendant in error, without a consideration of the merits or opinion as to the extent of the error, and although a public question is involved. For this rule to apply, however, the confession of error must be sufficient and unequivocal, and be made with proper authority. A confession of error by some of several appellees cannot affect the rights and liabilities of the remaining appellees, or of claimants who have interpleaded and appealed; and it is held that respondent cannot have the cause remanded for new trial on confession of error where appellant asks judgment in his favor on the findings of the lower court.

"Some cases regard reversal on a confession of errors as being within the discretion of the appellate court; and, under this view, the court will usually reverse on a confession of error if it appears from the record, or appellant's brief, that the point or error relied on is well taken; but if it does not appear that there was in fact a harmful or reversible error, a reversal will be denied.

"A confession of error, with a prayer that the judgment be reversed and rendered, has been held equivalent to an admission that defendant in error is unable to establish facts necessary to recover on another trial."

The text above quoted is based upon a list of cases cited in the footnotes.

Our search has revealed but three cases in which a "confession on appeal" has been considered by this court: *Tacoma v. Dougan,* 4 Wash. 796, 31 Pac. 325; *Daniel v. Daniel,* 113 Wash. 698, 194 Pac. 376; and *In re Torp's Estate v. Wilson Creek,* 138 Wash. 695, 245 Pac. 32. In the *Dougan* case, *supra,* the appellant, who was the defendant below, argued upon appeal that the action against him had been prematurely brought. The respondent conceded that the point was well taken. In that situation, this court held that it was unnecessary to consider any question touching the merits of the controversy, and, accordingly, *reversed*

the judgment and directed that the action be dismissed.

The *Daniel* case, *supra*, reads, in its entirety, as follows:

"In an action between tenants in common on June 7, 1920, a receiver was appointed by the lower court, and from such order appointing a receiver, an appeal was taken to this court.

"Prior to the submission of the cause, respondent filed in this court a confession that the appeal was well taken, withdrew the briefs of respondent, and consented that the court grant the relief prayed by appellants and reverse the order at respondent's cost.

"The order appealed from is therefore *reversed* at respondent's cost." (Italics ours.)

In the *Torp* case, *supra*, the executor of a will brought suit to determine whether or not an inheritance tax was payable by the estate. The trial court held that the property there involved was subject to the tax, and the executor appealed. After the appeal had been perfected, and while it was pending in this court, the parties entered into a stipulation compromising and adjusting the state's claim and agreeing that the decision of the trial court be reversed. We quote the full holding of this court on that phase of the case:

"Doubtless, this court will, on an appeal of an action where private interests only are involved, direct a reversal on a confession of error by a respondent, without an inquiry into the merits of the controversy, and will in certain instances do so where the cause involves a public interest. *Tacoma v. Dougan*, 4 Wash. 796, 31 Pac. 325.

"But the usual instances in which an appellate court exercises its powers of reversal or affirmance over a judgment are in instances of existing controversies; instances where the order of the court will affect the merits of the controversy *and determine* some right of the litigants. In this instance, there is no longer any controversy pending. The parties have compromised and settled their differences, and the appeal is moot in so far as the court is concerned. It would

seem that in such a case the parties should not be permitted to stipulate the judgment of the court. The usual practice in such cases is to enter an order of dismissal, and seemingly some grave reason should be shown to exist before a departure from the practice is warranted. *Since a reversal requires a finding of error by this court, and a judgment of the court directing the lower court to set aside the judgment it did enter,* it calls in this instance for roundabout and burdensome procedure to accomplish an end which the parties themselves can accomplish by a mere satisfaction of the judgment of the trial court.

"No reason appears for a departure from the usual practice, and our order will be that the appeal be dismissed without costs to either party." (Italics ours.)

That case was later cited with approval in *Layton v. United States,* 78 F. (2d) 499.

We are convinced, both upon reason and upon the authorities hereinbefore cited, including, further, *DeHaven v. DeHaven,* 77 Ind. 236, that the confession on appeal by respondent Hanley cannot affect the rights or liabilities of the other respondents in the case, and as to them the motion to strike the confession will be granted.

In this connection, it may be stated, further, that the allegations of the confession, with respect to the alleged invalidity of the intermediary contracts between E. B. Hanley and respondent Joe Most, concern matters that are separate and distinct from appellant's original cause of action. Those matters arose subsequent to the entry of the decree by the trial court, and they can, and should, be determined in a separate suit. Likewise, the question as to whether or not E. B. Hanley may now, for any reason, cancel or terminate the voting trust agreements must be determined in a suit brought for that purpose.

As between Mr. Hanley and appellant, however, the confession on appeal stands upon a somewhat

different footing. Were it apparent by stipulation of those two parties, or were it otherwise shown by the record, that the controversy between appellant and respondent E. B. Hanley has ceased, and that nothing remains upon which a judgment could operate, it would undoubtedly call for *dismissal of the appeal* in so far as it affected E. B. Hanley. *Pacific Savings & Loan Ass'n v. Smith,* 121 Wash. 595, 209 Pac. 1086, 212 Pac. 582; *State ex rel. Burnham v. Superior Court,* 180 Wash. 519, 41 P. (2d) 155; *In re Brown,* 6 Wn. (2d) 215, 107 P. (2d) 1104. But there is neither stipulation nor other showing to such effect, and we cannot presume from the mere *ex parte* confession that the controversy has entirely ceased as between Mr. and Mrs. Hanley. It is, rather, to be presumed that, even as to Mr. Hanley, appellant will insist upon the affirmative relief requested in her complaint. Accordingly, we will not direct a dismissal of the appeal as to Mr. Hanley.

On the other hand, we are not disposed to order a *reversal* as to respondent E. B. Hanley, on the basis of his confession on appeal. This case does not belong to the usual type of instances wherein the court will direct a reversal upon a confession of error. On the contrary, it is a most unusual type of case, and the circumstances under which the confession has been made and presented are, to say the least, peculiar. Furthermore, aside from the fact that it is by no means clear that respondent E. B. Hanley by his confession submits to a decree against him according to the full prayer of appellant's complaint, there are the added circumstances that his confession rests upon alleged facts which came into existence after the decree by the trial court had been entered, and that the confession apparently is now offered primarily for its pos-

sible effect upon the appeal as against respondents other than E. B. Hanley himself.

To sustain the confession, would require a finding of error upon the basis of facts which were never called, and which could not have been called, to the attention of the trial court. For the reasons given, we will not direct a reversal as to respondent E. B. Hanley, but as to him will simply remand the cause to the trial court with direction that E. B. Hanley be allowed such time as the trial court shall fix within which he, upon notice to appellant and all the other respondents, may, if he so desires, in open court confess judgment as against himself, whereupon the decree as entered may be amended accordingly.

Turning now to the merits of the case, we state at the outset that the record is entirely devoid of testimony tending to establish appellant's original theory that respondents Most and defendant Bevan entered into a *conspiracy* to profit at the expense of respondent Hanley or the Hanley community. Likewise, there is not a scintilla of evidence to substantiate the allegation in the complaint that respondent Joe Most "has in his possession or under his control other properties and securities belonging to the [Hanley] community." Appellant has evidently recognized those facts, and has abandoned her original theory as well as the claim latterly mentioned. Upon appeal, she relies entirely upon the following five main contentions: (1) That the creation of the voting trust agreements was beyond the husband's power as manager of the community property; (2) that, even if otherwise within the husband's power, the trust agreements are voidable by her because made with intent to injure her; (3) that, in any event, respondent Joe Most should be removed as trustee because of hostility existing between him and appellant; (4) that, if the trusts are

not set aside presently, it should be decreed that they shall terminate at the death of Mr. Hanley; and (5) that Mr. Hanley should be enjoined from giving away community personal property.

The first contention, that the execution of the voting trust agreements was beyond the husband's power as manager of the community, is predicated upon the argument that the transaction was outside the ordinary course of community business. The facts are emphasized that the effect of the trusts is to vest control of seventy-five per cent of the community property in respondent Joe Most, and that, allegedly, the community received no benefit or consideration, inasmuch as respondent Joe Most reserved the right to resign as trustee at any time. The entire transaction, it is claimed, constituted a "gift of control to Mr. Most." Appellant does not contend that consideration is essential to the validity of a voluntary trust. Her position is simply that, under the community property law, the absence of consideration rendered the transaction invalid as against appellant.

The basic question involved in this connection, and in this entire case, for that matter, is the extent of the husband's power as manager of the community property.

Rem. Rev. Stat., § 6892 [P. C. § 1433], provides:

" . . . The husband shall have the management and control of community personal property, *with a like power of disposition as he has of his separate personal property,* except he shall not devise by will more than one-half thereof." (Italics ours.)

The express language of Rem. Rev. Stat., § 6892, thus provides for complete and unrestrained power of disposition in the husband, with the exception that "he shall not devise . . . more than one-half thereof." The fact remains, however, that the husband is

the manager, not the owner, of the community property, and accordingly there is the further qualification, inherent in the husband's statutory authority, that such power must be exercised *for the community and in the community interest.*

Thus, this court has held that a *gift* of substantial community property by a husband to a paramour is void (*Marston v. Rue,* 92 Wash. 129, 159 Pac. 111); that community property is not liable for a judgment against the husband for alienation of affections of another man's wife (*Schramm v. Steele,* 97 Wash. 309, 166 Pac. 634); that a husband may not, without the consent of his wife, make a *gift* to his sister of a substantial sum of money belonging to the community (*Parker v. Parker,* 121 Wash. 24, 207 Pac. 1062); that the community is not liable on the guaranty by the husband of a son-in-law's promissory note, where there is no material benefit to the community (*Sun Life Assurance Co. v. Outler,* 172 Wash. 540, 20 P. (2d) 1110); that the husband may not, by bill of sale executed without the knowledge or consent of his wife, dispose of the major part of the community personal property for the purpose of creating a trust in favor of his son (*In re McGovern's Estate,* 181 Wash. 231, 42 P. (2d) 796, 46 P. (2d) 1118); that the husband may not, without the consent of his wife, make a *gift* of a substantial community bank account to his mother (*Nimey v. Nimey,* 182 Wash. 194, 45 P. (2d) 949); that the community is not liable for costs in a criminal action against the husband arising out of the burning of community property (*Bergman v. State,* 187 Wash. 622, 60 P. (2d) 699, 106 A. L. R. 1007); that the husband may not, without the knowledge or consent of his wife, make a *gift* to his children of corporate stock belonging to the community (*In re McCoy's Estate,* 189 Wash. 103, 63 P. (2d) 522); and that a life insur-

ance policy, the premiums on which were paid out of community funds, constitutes community property, and the husband may not, without the consent of his wife, substitute his mother and his private secretary as beneficiaries in place of his wife, who was the original beneficiary named therein (*Occidental Life Ins. Co. v. Powers,* 192 Wash. 475, 74 P. (2d) 27, 114 A. L. R. 531).

▮ The husband is given management and control of community personal property "for the purpose of facilitating the business of the community" (*Stewart v. Bank of Endicott,* 82 Wash. 106, 143 Pac. 458; *Marston v. Rue, supra; In re McGovern's Estate, supra*), or, as this court expressed the rule in another case,

" . . . the management and control conferred by statute [citations] on the husband . . . is a management and control *for the community and in the community interest.*" (Original italics.) *Schramm v. Steele,* 97 Wash. 309, 166 Pac. 634.

Appellant, however, is not content with the rule as above expressed, but insists strenuously that the husband's authority is not only limited to transactions *on behalf* of the community, but also is restricted to transactions in "the *ordinary* management of the community business." Such a rule, of course, would directly contradict the extremely broad statutory provision that "the husband shall have the management and control of community personal property, with a like power of disposition *as he has of his separate personal property.*" (Italics ours.) We cannot conceive of any language which would more clearly express the thought that the husband's authority shall be complete, so long, of course, as he is acting on behalf of the community. Specific language to that effect could not be stronger than the present statutory language.

It is true that one of our early cases (*Brotton v. Lan-*

*gert,* 1 Wash. 73, 23 Pac. 688) contains language which lends support to appellant's contention, and that some of that language has been quoted in several later cases (*In re Wood,* 110 Wash. 630, 188 Pac. 787; *In re Mc-Govern's Estate,* 181 Wash. 231, 42 P. (2d) 796); but it is clear that those cases did not involve the precise problem which is here involved, and that they by no means indicate a purpose on the part of this court to contradict the express language of the statute.

In the *Brotton* case, for instance, the sole question involved was whether or not a judgment based upon a separate tort by the husband constituted a lien on community *realty,* and the language in the opinion relied upon by appellant was pure dictum. *In re Wood, supra,* merely involved the question of the right of the wife of one adjudicated incompetent to be appointed guardian of the community property. The *McGovern* case involved the validity of an absolute disposition of community property for the purpose of creating a trust in favor of a child of the community. Those cases clearly do not hold that transactions by the husband for the community and in the community interest will be *ultra vires* the husband's authority if the transactions are not also made in the *ordinary* course of the community business.

Furthermore, in the case of *Allen v. Allen,* 184 Wash. 627, 52 P. (2d) 353, decided subsequent to each of the cases just mentioned, this court went so far as to refuse to give a wife credit for the amount of a five thousand dollar payment made by her husband on account of damages allegedly inflicted by the wife on her sister-in-law. Any obligation existing in favor of the sister-in-law as a result of the tort, was a separate obligation of the wife, and the payment was clearly outside "the ordinary community business." The holding of that case refutes appellant's contention.

Illustrative of the broad powers resting in the husband, is the case of *Catlin v. Mills,* 140 Wash. 1, 247 Pac. 1013, 47 A. L. R. 545, in which it was held that a payment by the husband on a community debt, after the statute of limitations had run, revived the obligation as against the community, on the ground that when the husband "made payments upon a community obligation, he was acting for its benefit and in its behalf." In *Way v. Lyric Theater Co.,* 79 Wash. 275, 140 Pac. 320, it was held that it was immaterial whether or not a particular transaction proved to be a profitable one. In other words, the husband's act may be to the detriment of the community and still be binding upon it—that is, the act still would be within the scope of his authority—if done for the community. As already indicated, any other conclusion would nullify the express language of Rem. Rev. Stat., § 6892 [P. C. § 1433], would seriously hamper the management of community property, and would result in constant litigation between spouses as to the advisability of specific transactions.

The test being whether or not the husband acted for the community and in the community interest, the alleged facts in the instant case that the transactions involved seventy-five per cent of the community property, that the community received no consideration for the transfer, etc., are in themselves not determinative. Such facts are relevant only to the extent that they may lend support to a charge that the husband did not act on behalf of the community. We turn, then to a consideration of the facts relied upon by appellant in support of her attack on the validity of the voting trust agreements.

Appellant alleges, first, that there was no consideration for the voting trust agreements, and no mutuality of obligation therein. As already indicated, it

is argued that the voting trusts amounted simply to a "gift of control" by Mr. Hanley to Mr. Most, and that such a "gift," just like the gift of an automobile or of money, as was the case in *Marston v. Rue, supra,* and in *Parker v. Parker, supra,* respectively, is voidable at the suit of the wife.

If we concede the absence of any consideration, in the contractual sense, it by no means necessarily follows that the execution of the voting trust agreements was beyond the husband's authority. Appellant frankly admits that voting trust agreements executed "in the ordinary management of community business" need not be consented to by the wife, and, further, that consideration is not essential to the validity of a voluntary trust. Appellant's allegation with reference to absence of consideration would thus appear to be simply a repetition of her contention that the husband's authority is limited to "the ordinary management of community business," and is answered by what has already been said. In a situation where there could be no question but that the husband acted for the benefit of the community in creating a voluntary trust, the absence of consideration would clearly give the wife no ground for interfering with the matter. In the cases relied upon by appellant, it was not the fact in itself that the husband had made, or had attempted to make, gifts to third parties that determined the result in each of those cases; it was the fact that the gratuities involved were totally disconnected with the management of the community enterprise.

In this connection, appellant also contends that the case of *In re McGovern's Estate,* 181 Wash. 231, 42 P. (2d) 796, 46 P. (2d) 1118, to which reference has already been made, is controlling of the instant situation. In that case, the wife of the decedent instituted an action to set aside a bill of sale wherein the husband,

in his lifetime, had transferred to his brother the community interest in certain partnership property in consideration of an oral promise by his brother to transfer such property, in turn, to a corporation, to issue twenty-five per cent of the stock of such corporation to the son of the husband and wife, and to furnish "such funds as were necessary to provide for the care, maintenance and education of [the son] during his minority." That transaction was held to be beyond the husband's power as manager of the community personalty.

We cannot agree that the *McGovern* case is controlling of the case at bar. That case simply presented a set of circumstances involving an *absolute transfer* of community property for the sole benefit of the child. Accordingly, that decision only reiterates the rule laid down by this court to the effect that a husband may not, without the consent of his wife, make a personal gift of community property or credit to a third party (*Marston v. Rue, supra*), even though the third party be a sister (*Parker v. Parker, supra*), a mother (*Nimey v. Nimey, supra*; *Occidental Life Ins. Co. v. Powers, supra*), or a son-in-law (*Sun Life Assurance Co. v. Outler, supra*). In other words, the *McGovern* case merely presented a typical situation involving an absolute disposition of community property for what was not a community purpose. That case is by no means determinative of the issue here. Whereas the *McGovern* case involved complete disposition of the property, the case at bar involves, theoretically, at least, simply a change in form of certain community assets for a maximum period of ten years. The right to all dividends from the stock in question remains in the community; the community gains the benefit of the exercise of the trustee's judgment during the period of the trust; and the stock will revert to the community at the termination of the trust.

■ Appellant next turns to analogy in support of her contention that the voting trust agreements are invalid. Asserting that

". . . the evidence is undisputed that Mr. Hanley's age, poor condition of health and life expectancy make it highly probable that the term of the trusts will outlast Mr. Hanley's life,"

and making the assumption that the trusts will fall at Mr. Hanley's death, appellant relies upon kindred illustration to show that the trust should be held invalid from the outset. It is pointed out, for example, that it has been held that a voting trust agreement providing for a period in excess of the statutory maximum is wholly invalid, not merely invalid as to the excess period.

We do not agree with appellant, however, that the evidence is undisputed that Mr. Hanley's age, poor condition of health, and life expectancy make it highly probable that the term of the trusts will outlast Mr. Hanley's life. There is no direct evidence in the record as to the probability of the trusts outlasting Mr. Hanley. It is true that the fact of his age and the fact that he has been a very ill man for the past few years do appear in the record. While the life expectancy of a man seventy-six years of age on the basis of the American Experience Table of Mortality is mentioned in the trial court's memorandum opinion, there is not a word of testimony in the record as to Mr. Hanley's personal life expectancy. We are aware of no theory under which this court is entitled to anticipate the fact of a person's death, and to adjudicate matters presently on the basis of an assumption of occurrence of the grim event within a particular period. This court is in no position to say that the voting trust agreements will outlive Mr. Hanley. Appellant's analogy therefore loses its validity.

A further argument, made in this connection by appellant, is that she is entitled "to have her husband manage the community estate rather than some stranger hostile to her." Analogy is again resorted to, appellant asserting that her position is supported by the rule that neither an agent nor a trustee can, over the objection of the principal or beneficiary, delegate the performance of discretionary acts to another. It is argued that a husband is likewise powerless to delegate his discretionary powers where such delegation is outside the ordinary management of the community business. A husband, it is insisted, may not abdicate his position as manager of the community property in favor of a third party.

Whether or not a husband is entitled to abdicate his position as manager of the community property in favor of a third party, the record before us falls far short of showing any such abdication in the instant case. Respondent E. B. Hanley testified positively and repeatedly that he felt that it was to the advantage of his family to have Joe Most "in charge of the cannery and all these properties," and that it was for that reason that he executed the agreements. He was acting, in other words, according to his testimony, for the benefit of the community. He was exercising the discretion resting in him as manager of the community property.

Further, the power granted to respondent Joe Most is specific and is limited by the terms of the instruments. It is a power which he has as trustee, not the power of a husband acting as statutory agent for the community. The fact that the specific power granted is one which respondent E. B. Hanley previously had as manager of the community property, is immaterial. The same would be true of any delegation of a discre-

tionary power by a husband, regardless of how trivial or how proper the delegation might be.

Appellant concedes that the husband has power to delegate authority "in the *ordinary* course of business," but insists that such delegation is not permissible in a case, such as this, where the delegation results in a transfer of control over approximately seventy-five per cent of the community property. This argument is, again, simply a repetition of appellant's basic contention that a husband's authority is limited to transactions in the ordinary course of community business and is accordingly answered by what has already been said herein. At this point, suffice it to say simply that, under the very broad authority granted by Rem. Rev. Stat., § 6892 [P. C. § 1433], a delegation of power by the husband, when made for the benefit of the community, must be held to be within the husband's authority.

The amount involved in the transaction would, at most, be a fact to be considered in determining whether or not the husband was indeed acting on behalf of the community. As already indicated, so far as the record here shows, the transaction in question constituted an exercise of the husband's statutory power, not its abdication. As the trial court found,

". . . by his act he [respondent Hanley] has fully and completely exercised the judgment and power vested in him."

Appellant concludes her argument in support of her opening contention with her "reasons for disagreeing with [the] trial court's view." She states at this point that

"Although the trial court recognized that the voting trust agreements were quasi-testamentary in character, he failed to note that *by virtue of that fact* the voting trust agreements were not executed in ordinary

business management of the community. . . ."
(Appellant's italics.)

We concede that the argument just quoted may constitute a proper ground for invalidation of the trust agreements to the extent that they *may* outlive respondent E. B. Hanley. In addition to any "quasi-testamentary" effect, however, the agreements have a present effect, of which respondent E. B. Hanley, according to his own testimony, was aware at the time that he signed the agreements. As to the validity of the trusts after Mr. Hanley's death, the trial court simply held that the consideration of that problem at the present time was premature. That phase of the case is the subject of one of appellant's main contentions on this appeal, and will be considered later in this opinion. The trial court, in upholding the trust agreements, was merely passing on their validity prior to respondent E. B. Hanley's death. In so far as that period of time is concerned, the agreements are not testamentary in nature, and their validity must be determined by the considerations already outlined.

Appellant's second main contention is that the voting trust agreements, even if otherwise within the power of the husband to create, are, under the circumstances here involved, voidable at her suit because they were made with intent to defraud her. She argues that "intent to defraud in this connection may merely mean intent to deprive the wife of the benefits of her property."

This contention and argument is a rather ambiguous one. The trial court specifically found, as appellant admits, that Mr. Hanley's purpose in the execution of the voting trust agreements was the protection of his family. On the basis of the record, we agree with the trial court on that point, as we have already indicated. Ap-

pellant argues, however, that, granting that Mr. Hanley's primary motive was proper,

" . . . it is an undisputed fact in the case that Mr. Hanley and Mr. Most intended to deprive Mrs. Hanley of control over the bulk of the community property following the death ·or disability of Mr. Hanley."

Any such deprivation, however, would be the purely incidental result of an act done for what Mr. Hanley considered to be the benefit of the community. Mr. Hanley's primary purpose not having been to defraud his wife, it is obvious that an incidental effect of the transaction cannot have the effect of labeling the entire transaction as fraudulent. It would seem that appellant is here simply repeating her contention that the trust agreements are invalid to the extent, at least, that they provide for the existence of the trusts for a period that may exceed Mr. Hanley's lifetime. As stated before, the specific problem suggested by that contention is discussed elsewhere in this opinion.

Appellant's third main contention in the case is that respondent Joe Most should be removed as trustee because of hostility existing between him and her. On this point, the trial court was of the opinion, as appellant herself puts it, that she "had failed to prove 'sufficient hostility' and that 'most of the hostility shown is entertained . . . by Mrs. Hanley and her children toward Mr. Most.' " Appellant, of course, challenges the accuracy of that finding by the trial court.

Even if it be conceded, however, that "sufficient hostility" does exist between respondent Joe Most and appellant, it still would not call for removal of Most as trustee. Appellant is in error when she states that she is the real beneficiary of the trusts. It is the community composed of Mr. and Mrs. Hanley which

is the beneficiary. Mr. Hanley is still manager of the community, and he is the only one qualified to speak for it. Until such time as he ceases, for any reason, to be the manager of the community property, any claim of hostility and any request for removal of the trustee must come from him.

The instant case thus presents simply a situation where husband and wife disagree on a matter involving the management of community property. The result, of course, is that the husband's decision is controlling. *Baker v. Murrey,* 78 Wash. 241, 138 Pac. 890; *Bellingham Motors Corp. v. Lindberg,* 126 Wash. 684, 219 Pac. 19. The fact that "what Mr. Most may do between now and Mr. Hanley's death may never be known or discovered by the plaintiff [appellant]" is immaterial. The same argument would apply in the case of *any* agent properly appointed by the husband, as well as to acts by the husband himself.

Appellant's fourth contention is that, if the trusts are not declared invalid presently, it should at least be decreed that they will terminate upon the death of Mr. Hanley. It is her position that a court of equity, in the interest of preventing further litigation, should provide relief of the sort here requested.

It may be conceded that a court of equity will, as appellant states,

" . . . decree full relief to the end of terminating litigation and eliminating the necessity for further litigation."

The relief to be granted, however, lies in the discretion of the court. McClintock on Equity, 27, § 21. In view of the fact that the problem, which would be created by the death of Mr. Hanley prior to the expiration of the voting trust agreements, is one which may never come into existence, we agree with the trial court that

disposition of that question is not now required. Not only is Mr. Hanley's life expectancy, like that of any other human, uncertain, but the developments pointed out in Mr. Hanley's confession on appeal make it appear probable that every effort will be made by him to terminate the trusts prior to the expiration date specified in the agreements. All in all, whether or not the problem involved in appellant's fourth contention will ever come into existence is dependent upon so many uncertainties that we do not feel that the court is called upon to dispose of that problem at the present time.

Appellant's final contention is that respondent E. B. Hanley should be enjoined from giving away any community personalty. The only property claimed to have been given away by Mr. Hanley consists of the occasional gifts which he made to defendant Bevan. Those gifts were, at most, trivial, and we agree with the trial court's statement that the bearing of that testimony "upon the substantial questions at issue in this lawsuit was too remote and irrelevant to justify its introduction."

We have dealt with that testimony only because so much time was given to it upon the trial, and so much space devoted to it in appellant's brief. In justice, however, to all the members of the Hanley family, we deem it fitting and proper to say here and now that there is nothing in this record that reflects upon Mr. Hanley's morality in connection with the so-called "Bevan affair." His acts appear to have been simply those of a kindly-disposed old gentleman who, with plenty of money at his command, saw no reason why he should not make an occasional gift to one who was regularly employed at a hotel where he usually stopped on necessary business errands. The amounts given may have been large enough to be of substantial aid

to the donee, but to him they were but trifles. To consider them as furnishing any basis for holding that Mr. Hanley was dissipating community property, would be to require every man, and, for that matter, every woman, to secure the consent of the other spouse before giving a third person a pecuniary tip or extending some inconsequential gratuity. The law does not concern itself with trifles.

If, upon remand, to the trial court, of the matter of respondent E. B. Hanley's confession on appeal, judgment should be entered against him on the basis of a confession then made, the relief here sought by appellant will thereby be obtained by her. In the absence of such judgment, the action of the trial court must stand. Regardless of respondent E. B. Hanley's statements and actions prior to the commencement of this suit, he testified, in response to a direct question by the court as to whether or not he felt he had a right to give away community property:

"I do not, and I never have given away any property only to the family. At no time have I given away only small amounts of stuff, and I have only made gifts to the family."

Before the court would be justified in enjoining respondent E. B. Hanley, it should appear, among other things, that, in the absence of such injunction, the party sought to be enjoined will do that which it is sought to prevent. Other than the alleged statements and acts made and done by Mr. Hanley prior to the time that he, under oath, disclaimed any belief on his part that he had the right to make gifts of community personal property, there is nothing in the record to indicate that he will, in the future, attempt to make substantial gifts to third persons. In the absence of such a showing, no basis exists for the entry of a restraining order in that respect.

It is true, as appellant asserts, that she will have no way of knowing of gifts which might be made, and that, if gifts should be made to several donees, a multiplicity of suits would be required to protect her interests. All of those considerations, however, are immaterial until the likelihood that the husband will violate his duty has been established. Very few wives are in a position to know of any gifts of community personal property which their husbands might make, and every wife would have to resort to many suits to recover community property from several donees. It does not follow from those facts, however, that every wife is therefore entitled to the entry of a restraining order against her husband.

As was stated at the outset, this entire case involves basically the question of a husband's authority as manager of the community, and the question of whether or not, in this particular case, the acts of respondent E. B. Hanley were done for the community and in the community interest. We must hold that E. B. Hanley had the requisite authority to execute the voting trust agreements, and that their execution was on behalf of the community. Respondent Joe Most, in his capacity as trustee, will be subject to all the duties and controls imposed by law upon persons in such fiduciary capacity. Appellant's case has rested largely upon a prediction of abuse by Joe Most of the powers granted him by the trust agreements. We cannot presume that Mr. Most will violate his trust. Should he, in the future, fail in his duty, the courts stand ready to protect appellant. As of the present time, however, no right to which appellant is entitled has been invaded, and no need for relief exists.

As to respondent E. B. Hanley the case is remanded to the superior court, with direction as already indi-

cated. As to all the other respondents, the judgment is affirmed.

ROBINSON, C. J., MILLARD, SIMPSON, JEFFERS, and DRIVER, JJ., concur.

BEALS, J. (dissenting)—In my opinion, the voting trust agreements referred to in the majority opinion were unilateral contracts, based upon no valuable consideration, and, like a power of attorney, subject to revocation at will. The filing of Mr. Hanley's so-called "confession on appeal" *prima facie* constitutes a revocation on his part of these voting trust agreements. It does not seem to me that this court should, upon the record before us, finally determine the effect of the "confession" which Mr. Hanley has executed. The judgment should be reversed and the cause remanded to the superior court to hear and determine all issues presented or to be presented as the result of Mr. Hanley's actions since the entry of judgment by the superior court. If the case has become moot, that fact should be determined by the trial court.

MAIN, J. (dissenting)—As I see it, the execution of the voting trusts by Hanley was not such an exercise of his right to manage and control the community personalty as is contemplated by the statute. On the contrary, by the execution of the voting trusts, he divested himself of all right of management and control—not for the benefit of the community, but for the benefit of Most. It is quite apparent that the sole purpose of the voting trusts is to protect Most, not Hanley nor Mrs. Hanley. Hanley not only divested himself of power of management and control of the community estate, but also attempted to divest Mrs. Hanley of any right of control after his death; for, when he executed the trust agreements, his life expectancy was less than six years.

474

To my mind, the transaction is not defensible on the ground that it is a legitimate exercise of Hanley's statutory right of management and control of community personalty.

I dissent.

BLAKE, J., concurs with MAIN, J.

[1]Reported in 115 P. (2d) 951.