[No. 3613–II.   Division Two.   September 12, 1980.]

JOHN PETERS, ET AL, *Respondents,* v. JEANNINE SKALMAN, ET AL, *Appellants.*

GWENDOLYN MCFARLANE, ET AL, *Appellants,* v. JOHN PETERS, ET AL, *Respondents.*

ESTATE OF WILLIAM C. PETERS, *Plaintiff,* v. JOHN PETERS, ET AL, *Respondents.*

*Kenneth W. Weber* and *Paul L. Henderson,* for appellants.

*Duane Lansverk,* for respondents.

PEARSON, A.C.J.—The question here concerns a property dispute among heirs of W. C. Peters and Marian Peters. Jeannine Skalman, Gwendolyn McFarlane, Richard Peters, and Marian Peters, hereinafter referred to as the Skalman group, appeal from several judgments entered in favor of John and Nickie Peters. The Skalman group has raised a number of issues, most of them involving challenges to the trial court's findings of fact. We are satisfied that the challenged findings are supported by substantial evidence and that the remaining issues do not require reversal. We therefore affirm.

W. C. Peters and Marian Peters, parents of Jeannine Skalman, Gwendolyn McFarlane, Richard Peters, Gayle Peters, and John Peters, were married in 1920. In 1935 the family moved to a 15–acre parcel of land at Mill Plain. The couple's marriage had always been stormy; they separated for the last time in 1943. From that time forward, W. C. held himself out as a single man. It was only after W. C.'s

death that it was discovered that he and Marian might never have been divorced.

In 1944, W. C., as an "unmarried" man, obtained a statutory warranty deed to the Mill Plain property from H. K. Lugger, his predecessor in title. Prior to that time, from 1935 to 1944, the tax rolls indicated that tax statements were sent to H. K. Lugger in care of W. C. Peters.[1] At all times thereafter until 1959, W. C. maintained the land and paid taxes therefor himself or with the assistance of John Peters. In 1959, W. C. made a wedding gift of the east half of the parcel to John and Nickie Peters. W. C. continued to take responsibility for the west half.

In 1971 the State of Washington commenced condemnation proceedings to obtain a strip of land lying across both the eastern and western halves of the parcel. On July 5, 1972, W. C. instructed Charles Gallup, a Vancouver attorney, to prepare a deed of gift in favor of John and Nickie Peters for the west half of the property. Mr. Gallup was to hold the deed until further instructions. At this time, W. C. was aware that he was terminally ill.

In September 1972, Mr. Gallup again spoke with W. C., who reaffirmed his intent to make a gift of the property to John and Nickie. Mr. Gallup, in accordance with W. C.'s directions, recorded the deed on September 26. That same month, W. C. gave John the condemnation proceeds on the west half of the property. Pursuant to an oral trust, John was to use the money to care for W. C., to pay the debts of his estate, and to divide the remaining proceeds equally among the five children. Although the precise amount of money placed in the trust is not readily ascertainable from the record, it appears to be somewhat in excess of $42,000.

W. C. became disillusioned with John, and on October 18, 1972, filed a complaint in Clark County cause No. 54114 to have the deed to the west half of the parcel set aside on

---

[1]The precise nature of W. C. Peters' and/or Marian Peters' interest in the land prior to 1944 is in dispute and was not resolved by the trial court. For the purposes of this opinion, we will assume the land was an asset of the community.

the bases of fraud, overreaching, and mistake. In addition, W. C. executed a second trust agreement, similar in terms to the oral agreement, but naming Jeannine Skalman and Gwendolyn McFarlane instead of John as trustees. Finally, W. C. attempted to revoke the oral trust. W. C. died in November of 1972. Marian Peters is still living.

In April 1975, John and Nickie Peters initiated an action seeking to quiet title to the west half of the Mill Plain parcel in Clark County cause No. 60879. All of the other children and Marian Peters were named as parties defendant. Gwendolyn McFarlane and Jeannine Skalman, as executrices of W. C.'s estate, filed a separate suit, cause No. 62062, against John and Nickie for quiet title and ejectment of both the west and east portions of the Mill Plain parcel and to recover the condemnation award. All three cases were consolidated for trial; the estate was substituted as party plaintiff in cause No. 54114. Trial was held in February and March 1978. The trial court found for John and Nickie Peters in all three cases. The Skalman group appeals.

This appeal is a challenge to the trial court's conclusion that by 1972 W. C. had obtained title to the west half of the Mill Plain property by adversely possessing Marian's community interest. Before addressing this issue, however, we will dispose of the Skalman group's contention regarding ownership of the east half of the property.

As their first assignment of error, the Skalman group contends that the trial court erred in determining that John and Nickie had obtained title to the east half of the property by adverse possession. We disagree. The evidence shows that besides using the property to graze farm animals, John built a fence between the east and west parcels, moved a barn onto the land, and made arrangements to have water lines connected to the property. In addition, it is undisputed that he and Nickie paid taxes on the land for a period in excess of the 7 years required by statute for individuals claiming under color of title. RCW 7.28.050.

Clearly, the trial court's findings and conclusions in this regard are appropriate. *See Peeples v. Port of Bellingham,* 93 Wn.2d 766, 613 P.2d 1128 (1980).

We will proceed to address the more difficult question: Did the trial court err in determining that W. C. had obtained title to at least the west half of the property as his separate estate by adversely possessing Marian's community interest? If W. C. had obtained title in that manner, he was free to deed the property to John and Nickie Peters in 1972; if not, Marian Peters is entitled to have the deed set aside. RCW 26.16.030 (formerly RCW 26.16.040).

An analysis of this issue requires that we review some of the well established concepts of our community property system of ownership between spouses. It is, of course, true that community property is a form of partnership, with each spouse owning an undivided one–half interest in every community asset. *In re Estate of Patton,* 6 Wn. App. 464, 494 P.2d 238 (1972). However, it is a special form of partnership with the spouses not only owing each other the highest fiduciary duties, but also with the husband (and since 1972 the wife) charged with the statutory duty to manage and control community assets for the benefit of the community. Cross, *The Community Property Law in Washington,* 49 Wash. L. Rev. 729 (1974). *Komm v. Department of Social & Health Servs.,* 23 Wn. App. 593, 597 P.2d 1372 (1979). This duty continues until the marriage ceases to exist—mere physical separation does not dissolve the community and terminate the obligation of the managing spouse to act for the common good. *See Dizard & Getty v. Damson,* 63 Wn.2d 526, 387 P.2d 964 (1964); *Cohn v. Cohn,* 4 Wn.2d 322, 103 P.2d 366 (1940). *See generally* Cross, *1972 Community Property Amendments,* 48 Wash. L. Rev. 527, 543 (1973). Losses as well as gains which result from the managing spouse's activities flow to the community, absent a showing of bad faith. *Hanley v. Most,* 9 Wn.2d 429, 115 P.2d 933 (1941); *Oil Heat Co. of Port Angeles, Inc. v. Sweeney,* 26 Wn. App. 351, 613 P.2d 169 (1980).

To hold that possession and control by a spouse charged with the duty to manage community property for the benefit of the marital unit could ever ripen into adverse possession would be to fly in the face of the above discussed principles. We are satisfied that there exists a conclusive presumption that possession of community property by a managing spouse can never be hostile to the interests of the other spouse and that such possession and management always inures to the benefit of the community.[2]

On the other hand, termination of the marriage relieves the managing spouse of his or her duty to act for the benefit of the lapsed community. This termination can result from legal action—divorce or dissolution—or when it can be determined that the marriage is defunct. Here, the trial court found that Marian and W. C. separated for the last time in 1943, and that thereafter their conduct indicated that the marriage had been renounced. The court therefore concluded that the marriage was defunct as of such date.

A defunct marriage exists where it can be determined that the spouses, by their conduct, indicate that they no longer have a will to union. *In re Estate of Osicka*, 1 Wn. App. 277, 461 P.2d 585 (1969); *MacKenzie v. Sellner*, 58 Wn.2d 101, 361 P.2d 165 (1961); *In re Estate of Armstrong*, 33 Wn.2d 118, 204 P.2d 500 (1949); *Togliatti v. Robertson*, 29 Wn.2d 844, 190 P.2d 575 (1948). Physical separation, by itself, does not negate the existence of the community. *Kerr v. Cochran*, 65 Wn.2d 211, 396 P.2d 642 (1964); *Rustad v. Rustad*, 61 Wn.2d 176, 377 P.2d 414 (1963). The test is whether the parties through their actions have exhibited a

---

[2]Although we agree with Marian Peters' contention that a husband (and now either spouse, as provided in RCW 26.16.030(3) in its present form) cannot hold adversely to his spouse's interest in community property during the life of the marriage, we do so for a reason different from that argued in her brief. Marian argues that adverse possession between spouses is impossible because a wife, until 1972, could not have brought an action to challenge the husband's wrongful possession. This is inaccurate. *Kimble v. Kimble*, 17 Wash. 75, 49 P. 216 (1897); *Hanley v. Most*, 9 Wn.2d 429, 115 P.2d 933 (1941); RCW 26.16.160 (civil disabilities of wife abolished). *See also* W. deFuniak & M. Vaughn, *Community Property* § 151, at 362 (2d ed. 1971).

decision to renounce the community "with no intention of ever resuming the marital relationship." *Oil Heat Co. of Port Angeles, Inc. v. Sweeney, supra* at 354. Although previous cases in which a defunct marriage was found involved a long separation following entry of an interlocutory divorce decree or execution of a written separation agreement, *Togliatti v. Robertson, supra; In re Estate of Armstrong, supra; MacKenzie v. Sellner, supra; In re Estate of Osicka, supra,* we are satisfied that so long as the actions of the parties evidence an intent to renounce the marriage, no such formal action is necessary. *In re Estate of Osicka, supra. See Togliatti v. Robertson, supra;* Cross, *The Community Property Law in Washington, supra.*

Evidence in support of the trial court's conclusion that W. C. and Marian's marriage became defunct in 1943 included proof of their 29–year separation, of the complete absence of contact between the two, and of statements made by each of them concerning his or her marital status. The evidence was sufficient to demonstrate that the separation in 1943 was intended by both to be permanent and that after such time there was no will to union. The trial court's conclusion was proper.

Because the marriage was defunct in 1943, after such time the community was effectively dissolved and W. C. was relieved of his duties to deal with the property of the former marital community for the common good. Neither he nor Marian was subject to those "liabilities incident to the marital status, which are based upon the reciprocal aspects of the relationship." *Yates v. Dohring,* 24 Wn.2d 877, 881, 168 P.2d 404 (1946). We find that after 1943 there was no legal barrier preventing W. C. from claiming adversely to Marian's interest in property of the former marital community. Therefore, the remaining problem is to review the evidence to determine whether the record supports the trial court's findings that W. C. claimed the entire Mill Plain parcel, and more specifically, the west half, in "actual and uninterrupted, open and notorious, hostile and exclusive" possession and to the derogation of Marian's

community interest. *Skansi v. Novak,* 84 Wash. 39, 45, 146 P. 160 (1915).

Adverse possession requires actions by the claimant that would serve to put a person of ordinary prudence on notice of a hostile claim. When the adverse possession involves land owned by cotenants analogous to the present situation, there is a presumption that possession by one tenant is possession by all and inures to the benefit of all. Adverse possession must be established by outward acts of "such an unequivocal character as to impart notice" of the intended ouster. *Nicholas v. Cousins,* 1 Wn. App. 133, 137, 459 P.2d 970 (1969). *Accord, Fritch v. Fritch,* 53 Wn.2d 496, 335 P.2d 43 (1959); *Church v. State,* 65 Wash. 50, 117 P. 711 (1911). We are satisfied that the evidence here was sufficient if believed by the trial judge to rebut this presumption. It includes: (1) the fact that the statutory warranty deed (promptly recorded) which W. C. received from the previous owner in 1944 was to W. C. Peters, an unmarried man; (2) proof of an incident, apparently in the mid–1940's, in which W. C. chased Marian off the property with a shotgun; (3) evidence that Marian did not enter the land after such incident and W. C. lived on the parcel off and on from 1935 until shortly before his death; and (4) the fact that in 1959 he made a gift of the east half of the parcel as a single man. We are satisfied that this evidence was sufficient to rebut the presumption that possession by W. C. inured to the benefit of the former marital community consisting of himself and Marian. By 1972, W. C. was free to treat the remaining piece of land, the west half of the parcel, as his separate property. Marian cannot have the gift set aside on the ground that it was an unauthorized transfer of community property.[3]

---

[3]At trial, and in this court, Marian Peters also argues that the statute of limitations should have been tolled because of her mental incompetence. The trial court determined that she was not insane as required by the applicable tolling statute, RCW 7.28.090 (repealed and recodified in 1977 to refer to incompetence). The record, including a document of release from Western State Mental Hospital in 1950, supports this finding. *See* Rem. Rev. Stat. § 6950 (repealed in 1951)

As the second prong of its attack, the Skalman group attempted to have the 1972 transfer of the west parcel and the oral trust set aside on the bases of fraud, undue influence, and overreaching. The trial court entered findings in opposition to the group's position. These findings are challenged on appeal.

█ A will, gift, or contract can be invalidated on the basis of undue influence, a form of fraud, when it can be said that the influence exerted by the donee was so persistent or coercive as to "subdue and subordinate the will of the [donor] and take away his freedom of action." *In re Estate of Martinson,* 29 Wn.2d 912, 914, 190 P.2d 96 (1948). Facts which may give rise to a suspicion of undue influence are (1) that the beneficiary occupied a fiduciary or confidential relation to the donor; (2) that the beneficiary actively participated in the preparation of the document or will providing for the transfer; and (3) that the beneficiary received an unnaturally large share of the estate. In addition, the courts look at the relationship between the parties, the opportunity for exerting undue influence, and the naturalness of the gift. *In re Estate of Smith,* 68 Wn.2d 145, 411 P.2d 879, 19 A.L.R.3d 559 (1966). The question whether a gift or bequest is the result of undue influence is one for the trier of fact, *McCutcheon v. Brownfield,* 2 Wn. App. 348, 467 P.2d 868 (1970), and will be overturned only if there is no substantial evidence in the record to support the findings of the trial court.

We will now consider evidence introduced concerning the gift of the west parcel. Mr. Gallup testified that he spoke with W. C. Peters both in the hospital and in his own office, and he was satisfied that W. C. understood he was making a gift of the parcel and the other children would receive no interest in the land. Mr. Gallup further testified that he

---

(supervisor of mental hospital was charged with determining when a patient is no longer insane). In addition, Marian argues that the statute of limitations should have been tolled because she was out of the jurisdiction during the relevant time periods. This argument was not presented to the trial court and therefore will not be considered on appeal.

spoke with W. C. Peters alone during at least one of these conversations. In addition, it must be remembered that W. C. Peters took the first steps toward making the gift—having the deed drawn—in July of 1972 before he was hospitalized and when he was still physically strong. Other witnesses testified that W. C. Peters and his son John had a close, if somewhat stormy, relationship. John helped his father on the farm, helped pay his taxes, and at times supplied him with use of a car. Finally, the gift was logical because John Peters already owned and managed the east half of the property. Even if it is assumed that John and W. C. Peters shared a confidential relationship, we are satisfied that the record supports a finding that the gift of the parcel was not the result of undue influence, fraud or coercion.

It is difficult to comprehend how the trust could in any sense be considered the result of undue influence. John received no disproportionate benefit from the transfer. He was to use the trust monies to pay for W. C. Peters' medical care, last expenses and debts, and to divide the remaining money equally among the five children. Again, we are satisfied that the trial court's findings are proper.

■ We need not discuss in depth the Skalman group's remaining assignments of error. The terms of the oral and written trust are the same; the only difference is the substitution of Gwendolyn McFarlane and Jeannine Skalman in place of John Peters as trustees. At this time, the only duty of the trustees is to divide the remaining money. There is nothing for us to resolve in this regard. The trial court's findings must stand. Arguments concerning W. C. Peters' October 1972 attempt to revoke the power of attorney given to John Peters have been mooted by his death. *See Valentine v. Duke,* 128 Wash. 128, 222 P. 494 (1924); *Larson v. Anderson,* 97 Wash. 484, 166 P. 774 (1917). Finally, we need not address the Skalman group's attempt to have the pretrial settlement set aside because the trial court did not rely on the settlement agreement in reaching its decision.

The trial court's judgment is affirmed in all respects.

PETRIE and PETRICH, JJ., concur.

Reconsideration denied October 17, 1980.

Review denied by Supreme Court December 19, 1980.