**JUANITA WILKINSON AND AMERICO CASTILLO, Plaintiffs**

v.

**ARISTIDE M. SIMMON AND OLIVIA H. SIMMON, Defendants**

Civ. No.799/1991

Territorial Court of the Virgin Islands

Div. Of St. Thomas and St.John

May 23, 1996

Judith L. Bourne, Esq., St. Thomas, U.S.V.I., *for Plaintiffs*

Richard P. Farrelly, Esq., (Birch deJongh, Hindels & Hall), St. Thomas, U.S.V.I., *for Defendants*

SWAN, *Judge*

## MEMORANDUM OPINION

This Court must decide whether to set aside two deeds executed by plaintiffs' mother, an octogenarian, which transferred three parcels of property to defendants. For the reasons which follow, the deeds will be set aside.

## FACTS

Plaintiffs are the children of the late Ada Battiste ("Battiste") of St. Thomas, who was born on July 9, 1900 and died on June 22, 1991 at the age of ninety, leaving plaintiffs as her heirs at law. For more than fifteen years preceding her death, Battiste lived alone. Her children resided off-island between the time of 1960 and the time of Battiste's death, if not longer.

In the mid-1960's, Defendant Aristide Simmon ("Simmon") befriended Ms. Battiste. In subsequent years, Battiste and Simmon developed a unique relationship, which culminated in Simmon becoming Battiste's only confidante and de facto guardian. The relationship between Battiste and Simmon is worthy of elucidation, even though they were not related by blood or by marriage. Defendant Olivia H. Simmon is the spouse of defendant Simmon.

Essentially, Battiste resided in Estate Thomas, St. Thomas, Virgin Islands in the area commonly called "Raphune Hill." One day in

75

mid-1968, Simmon was operating a vehicle, when he encountered Battiste, as she was walking up Raphune Hill to her home. Simmon stopped and gave her a ride. In 1968, Battiste was a total stranger to Simmon. She was then sixty-seven (67) years of age; Simmon was twenty-seven (27) years old. Battiste habitually, if not daily, would walk to and from her residence by utilizing Raphune Hill.

The next day, Simmon met Battiste and promptly offered her a ride which Battiste accepted. Thereafter, Simmon would offer her rides which Battiste always accepted. Simmon routinely used the Raphune Hill route to travel to his Estate Bovoni home. During those rides, Battiste and Simmon would quite naturally engage in conversations.

Eventually, Battiste and Simmon became close friends, despite their age disparity of forty years. The friendship which would become tantamount to a relationship of trust and personal confidante, continued until Battiste's death in 1991.

In 1976 and with Battiste's tacit approval, Simmon began to utilize Battiste's post office box as his mailing address.

Battiste, who was a regular Moravian Church attendee and former Sunday School teacher, would now be chauffeured by Simmon to and from church every Sunday at no cost to her. Before Simmon knew Battiste and for innumerable years, Battiste would habitually visit her longtime friend, Mary Francis, every Sunday after church. After these afternoon social visits including meals, Francis' husband would unfailingly drive Battiste to her home. However, after befriending Battiste, Simmon would undertake the Sunday chauffeuring chore.

Eventually, Simmon began handling all of Battiste's personal affairs and business, including cashing her social security checks, doing her regular grocery shopping and other necessary errands, retrieving her mails from her post office box for which he now had a key, and transporting her to and from doctors' appointments. From Battiste's income and financial assistance she received from her children, Simmon oversaw the paying of Battiste's telephone and electrical bills. One year Simmon utilized his vacation to paint Battiste's home, ostensibly at no cost to Battiste. Slowly and inexorably, Battiste began a unique dependency upon Simmon. Simmon never attempted to dissuade the dependency. Rather, he

encouraged it; he was extremely receptive to it, and he would actively bolster Battiste's dependency on him by willingly performing these chores for Battiste. By 1976, Simmon had become a regular visitor to Battiste's home. His visit were daily or several days a week.

In the later years of the relationship, Simmon, a church deacon at the Bovoni Baptiste Church, would daily but alone, pray with Battiste at her home. Their friendship, at this juncture, became stronger as Battiste now began to rely almost exclusively on Simmon to manage her daily business and personal affairs.

Nearing the end of Battiste's life, Simmon would customarily drive Battiste to and from his home for Sunday dinners with his family. Sometimes Simmon and his wife would prepare meals at their home, which would be eaten by the three of them at Battiste's home.

With the passing years, Battiste commensurately became more dependent on Simmon. For example, although Battiste was a homemaker and could do her cooking, Simmon endeavored to prepare Battiste's breakfast, lunch and dinner on a daily basis. If the meals were not prepared at Battiste's home, Simmon would personally deliver the meals to her house.

By the 1980's, Simmon became Battiste's personal spokesperson in her contacts with her family members and friends. In her last years, and in conversations with her children, Battiste would customarily refer to anything she was doing or planning to do as "We will do or are doing" instead of "I plan to do or I will do" something. The "we" in her statements was an obvious reference to both Battiste and Simmon. Suffice to say, Battiste, in her last years, would not do anything without first consulting Simmon. More succinctly, Simmon was Battiste's "man of business," as he handled and supervised the full dimension of her daily life and business affairs.

Importantly, Simmon, would transport Battiste to the attorneys' offices to execute her Last Will and Testament and to execute the deeds to properties which she conveyed to Simmon and his wife.

Battiste's first cousin, Louise Arnett, would also undertake some of the chores for Battiste, such as her shopping. However, she did not do so to the extent that Simmon did.

In the mid-1980's, Battiste, to some degree, became alienated from her children for no apparent reason. Similarly, Battiste who had enjoyed friendships with her close friends for more than thirty years, would also become withdrawn and isolated from her friends as well.

The Court finds another perplexing aspect to the relationship between Simmon and Battiste, which involved the "forbidden art," or "witchcraft" or "obeah[1] ." Battiste, for more than thirty years prior to her demise, had a fixation or obsession with obeah. On countless occasions, and long before she met Simmon, she would initiate discussions about obeah with some close friends and family members. No amount of assurances from her family and close friends of more than thirty years could dislodge, derail, or dissuade Battiste's unfailing belief about the "Forbidden Art," or convince her that obeah was something to be disregarded and ignored.

Despite her regular church attendance, Battiste became consumed or overwhelmed by her belief in obeah to the extent that the Court finds that she implicated Simmon in her obeah experiences. Whether Simmon was a reluctant or willing participant or no participant in these obeah matters depends upon the testimonial evidence. Simmon has vehemently and ardently denied any participation in such activities. Furthermore, Simmons offered testimony from other witnesses who knew Battiste for years who indicated that Battiste never discussed, intimated or broached the subject of obeah with them. Nonetheless, the Court finds compelling the testimonial evidence from several credible witnesses, two of whom have no interest in the outcome of this case. The testimonial evidence catalogued Simmon's overwhelming participation in the obeah activities.

The Court finds that in the 1980's Battiste began to earnestly believe that there were relics, ruminants, and other tangible evidence of obeah being placed in her yard or in proximity to her house by anonymous persons. She believed that the objective of

[1] 1. Although illegal, the subject of obeah had once enjoyed a preferred credibility and was once pervasive among the residents of St. Thomas, (see Jarvis, J. Antonio. *The Virgin Islands and Its People.* New York: Farlyn Enterprises, pg 115-134 and Title 14, Section 2221(6) of the Virgin Islands Code).

these persons was to coerce her into vacating her home and property, ostensibly because these persons wanted to take her properties. During the protracted hearings, the Court failed to find any modicum or scintilla of evidence to substantiate Battiste's fear. These relics of the "forbidden art" that were retrieved from her yard included chicken heads, rabbit foot, dead rats, and snakes. Likewise, Battiste believed that ants were placed in the yard to bite her. According to Battiste, no one but Simmon found these obeah paraphernalia on the property. Battiste contended that only Simmon could adequately dispose of these unholy findings, which had to be taken to someone conversant in obeah, outside the jurisdiction, to properly dispose of them. Of course, Battiste would finance the costs of these ventures for the disposal of the obeah relics.

The Court finds that Battiste would find solace and "peace of mind" in knowing that Simmon had consistently assuaged one of her greatest fears. The testimonial evidence informs that Battiste related the obeah findings to her children and to close friends. Nonetheless, several witnesses who testified for Simmon would vouch that Simmon never discussed obeah or related matters with them or, to their knowledge, with other third parties.

The Court finds difficulty in accepting that Battiste would deliberately tell falsehoods about Simmon or utter mendacious pronouncements against someone she regarded as her caretaker. Yet, on two separate instances of questioning by the Court, Simmon unhesitatingly denied that he ever discussed the subject of obeah with Battiste. Simmon was emphatic that he "never, never, never discussed obeah or obeah related matters with Battiste."

Assuming Battiste to be of a sound mind, and being mindful of the valued relationship she enjoyed with Simmon, it is inexplicable as to what would be her motive for implicating Simmon in these elaborate and detailed obeah activities, if they were not true.

At the time of her death, Battiste's relationship with her children had become strained. By 1986, Battiste had changed her attitude towards her children. Similarly, by 1988, Battiste became bitter towards her children. One reason for her bitterness was that she became convinced or someone had inculcated in her mind that her children had plans to relocate her to a nursing home facility.

The Court finds that Battiste's daughter, plaintiff Juanita Wilkinson, and her husband had built a new masonry house for Battiste's use, adjacent to or contiguous to the land on which Battiste was residing; however, for some inscrutable reason, Battiste refused to relocate to the new house, despite her daughter's urging. Accordingly, it escapes the Court why Battiste believes that her children had planned to relocate her to a nursing home. Importantly, during the inception of the change in the relationship between Battiste and her children, Simmon was the only person seeing Battiste daily at her home.

Prior to 1988, Battiste would write her daughter, and Wilkinson would write to her mother. The communication between mother and daughter was fairly regular. (see plaintiff's exhibits 20, 35, 37).

The Court has intensely scrutinized seventeen letters written by Battiste to her daughter, encompassing the period of May 6, 1969 to October 9, 1984. Five letters were written in the 1970's and six letters were written in the 1980's. While these letters are not exhaustive of all letters written by Battiste to her daughter, certain aspects of mother-daughter relationship emerged. During that fifteen year period, the letters, except for one, are absolutely devoid of any animosity or disagreements between mother and children. In the January 7, 1988 letter to her daughter and less than three months after the October 28, 1987 deeding of land to Simmon, Battiste admonished her daughter for questioning the physician about Battiste's health rather than inquiring of her mother directly. Battiste was so incensed that she threatened to return the dresses and other items her daughter had shipped to her. But, the letters have certain commonalities that are illuminating on how Battiste regarded her relationship with her daughter. Battiste ended two letters with the words: "Love Mother." The other letters she consistently ended with the words; "I closed lovingly mother," as she did in the October 9, 1984 letter. Additionally, in her letters to her daughter, Battiste acknowledged receipts of cards, checks, money orders, food items, clothing, gifts and other things including "special fitting" shoes.

The letters are otherwise covering routine family matters which is of no concern to the Court.

In three letters dated January 12, 1984, June 21, 1984 and October 9, 1984, written by Battiste to her daughter Battiste closed all the

letters with words of endearment. Again, these letters are devoid of the most minor form of estrangement between mother and daughter which would impel Battiste to give everything she owned to a non-relative. Moreover, these letters provide no motive for Battiste desiring to disinherit her children. Rather, the letters catalogue a friendly, close, family relationship between mother and daughter in which the daughter gave her mother regular financial assistance.

Plaintiffs were sending their mother clothes, shoes, packages, food, and other items to assist her with her living expenses. Sometimes the food stuff and canned goods were too much for Battiste. Therefore, she would distribute them to her close friends.

Battiste's children would call her regularly on the phone. For instance, plaintiffs introduced in evidence thirty-four (34) telephone bills of Battiste's son, plaintiff Americo Castillo, who was residing in Puerto Rico. The bills cover a period from January 7, 1988 to April 7, 1991. The bills inform that Battiste's son regularly called his mother and as much as two, three and four times in a single month. Additionally, checks were introduced in evidence confirming that the daughter remitted checks to Vitelco to pay her mother's telephone bills.

The children sent Battiste money orders to assist her with living expenses. Then, and most abruptly, in the late 1980's Battiste began to refuse the children's money orders or financial assistance.

Although the plaintiffs resided off-island most, if not all of their adult lives, they made annual or bi-annual visits with their families to Battiste and stayed in her home. These visits were a customary practice for innumerable years.

Considering the relationship Battiste had with her children, the Court finds bedeviling why she would inculcate in her mind that they had abandoned her.

As Battiste became increasingly distant from her children, she became closer to Simmon, during which time, Simmon became her only confidante and sole advisor in her daily and business affairs.

Because of Battiste's relationship with Simmon, she wanted him to have everything she owned or all her earthly possessions, including her real and personal properties. She wanted Simmon to be in charge of everything and for her children not to evict him from the properties after her death. Several of Simmon's witnesses

81

testified that Battiste expressed her desire that she wanted Simmon to have everything, ostensibly in gratitude for what he had done for her and for taking care of her. No other person spent as much time with Battiste that is remotely close to the time Simmon daily spent with her in the 1980's.

By the 1980's, Battiste began to act with indifference towards her son, Americo. While the practice for years was that the children would stay at Battiste's home when they annually came to St. Thomas, in the mid-1980's, it became uncomfortable for Battiste's children to stay at their mother's home, as the specter of indifference would now permeate the home atmosphere.

On September 30, 1985, Battiste executed a deed conveying her properties, Parcel Nos. 6M-E and 6M-D, Estate Thomas No. 6 New Quarter, St. Thomas, Virgin Islands to defendants, Aristide Simmon and his spouse, Olivia Simmon, but reserving to herself a life Estate for the natural life. On October 28, 1987, Battiste conveyed by Deed of Gift solely to defendant Aristide Simmon, Parcel No. 6D-3 Estate Thomas, No. 6 M New Quarter, St. Thomas, Virgin Islands. At the time of these conveyances, Battiste was 85 and 87 years of age respectively. All the transaction were done at attorneys' offices with Simmon chauffeuring Battiste to the offices, and waiting outside of the offices, and returning her home. Battiste did not divulge to her children nor discuss the transactions with them prior to executing the deeds of conveyance. She did not want them to know about the transactions.

Battiste had acquired the properties in 1957 from her mother's Estate. Until befriended by Simmon, she wanted the properties to remain in her family from one generation to another, and she had expressed this sentiment to her children.

Of compelling importance is the fact that the same day of October 28, 1987 that Battiste executed the Deed of Gift conveying Parcel No. 6D-3 Estate Thomas to Simmon, was the exact day that Battiste also executed a general Power of Attorney giving Simmon vast and unlimited authority as her agent and attorney-in-fact "to make, do and transact any and all business of whatever nature or kind relating to my personal affairs." (see Defendant's exhibits 5 and 6).

Interestingly, Battiste, in her handwriting, would write a will, dated October 21, 1987, on a single piece of paper. However,

because of its legal deficiencies, the writing does not constitute a will. But, Battiste would execute a formal "Last Will and Testament" dated May 24, 1988 which was obviously prepared by an attorney and meets all the legal prerequisites for a legal Will. In the Last Will and Testament, Simmon is named as the Executor. Simon gets "all of the rest, residue and remainder of my estate. . . of real, personal or mixed property." The Will reminds all that Simmon already had been deeded the other house on Parcel No. 6M Estate Thomas, St. Thomas, U.S. Virgin Islands and two parcels of property. In the Will, Battiste bequeathed to each of her two sons and the granddaughter she reared a token one dollar ($1.00). Battiste's daughter, plaintiffs Wilkinson likewise received nothing under the will. Battiste had more than fifteen (15) years earlier conveyed to her Parcel No. 6MA Estate Thomas, Virgin Islands.

## ANALYSIS

The underpinning of the plaintiffs' suit is that after securing Battiste's trust and confidence, Aristide Simmon surreptitiously gained control over Battiste's mind to unduly influence her. Because of the undue influence, say plaintiffs, Battiste deeded or conveyed to Simmon and his spouse her real properties.

The Court notes that there is a discernible difference between a person being mentally ill as opposed to a person being controlled by another or being the victim of "undue influence" which influence caused the person to do certain things for the benefit or enrichment of someone.

The Court finds that Battiste never suffered from any mental illness. Dr. Leighmin Lu, a psychiatrist, examined Battiste in August, 1988 and found her mentally competent to execute a will. She was articulate, lucid and without any deficiency in her understanding. Further, there was no deterioration in her mental faculty, during the period in proximity to when the will was executed.

In 1986, Battiste sold land to a third party for *Thirty-One Thousand Dollars ($31,000.00)*. Simmon handled the transaction on Battiste's behalf. The surveyor who surveyed the land found Battiste to be lucid of mind in his conversations with her and that

83

she understood what she was doing. At the Attorneys' Offices, whenever Battiste signed anything, witnesses found nothing untoward with Battiste's clarity of mind.

Six months after Battiste executed the deed of September 30, 1985 which gave certain real property to Simmon, Dr. Lu found her not suffering from any mental disorder. But, by 1988 or 1989, and not surprisingly, Battiste, now an octogenarian, became very forgetful which could be attributed to her advancing age.

Attorney Frederick Rosenberg who handled Battiste's affairs in 1985 and who was circumspectful about the 1985 land transaction, went to great lengths to interrogate Battiste to make certain that she fully understood what she was doing, by transferring her property to Simmon rather than to her children. Attorney Rosenberg, sensing the unusual nature of what Battiste was about to do, transcribed verbatim his conservation with Battiste, before she executed the deed giving her land to Simmon to the exclusion of her children.

Nonetheless, this is not a case of someone being mentally ill, but rather a case of whether Simmon, because of his confidential relationship with Battiste, exerted undue influence over Battiste, to manipulate her into giving him all her earthly possessions to the exclusion of her children and other relatives. Was Battiste's actions the product of a mind that was controlled by Simmon's influence, warranting the setting aside of these deeds? Undeniably, Simmon was in a unique position to influence Battiste. He saw her daily over a protracted period leading to the date of the execution of the deeds. Likewise, during the same period, he unabashedly supervised and handled her affairs, while having countless conversations with her on a myriad of subjects.

Undue influence may be proven circumstantially, provided such evidence is of a substantial nature. The burden of proof is on the party contesting the transferring of property. Additionally, undue influence, however, may be presumed from a confidential relationship. *Estate of Depuest v. Allen*, 733 SW 2d 74 (Tenn. App. 1987). In determining the presence of undue influence, the Court looks at the relationship between the parties, the opportunity for exerting undue influence and the naturalness of the gift. *Peter v. Skalman*, 27 Wash. App. 247, 617 P.2d 448 (1980).

If a presumption of undue influence is found, the defendant must present clear and convincing evidence sufficient to rebut the presumption of undue influence. *Cruz v. Melendez*, 902 F.2d 232 (3rd Cir. 1990).

█ The circumstances surrounding the Battiste-Simmon relationship is one that was conducive to undue influence. Simmon enjoyed unrestricted access to Battiste outside the presence of all other persons. He visited her every day bringing her mails, bringing her spiritual upliftment through prayers, and bringing her meals. Simmon did her shopping and chauffeured her to and from church and doctors' appointments. Battiste relied upon Simmon's judgment. She relied upon Simmon in all aspects of her daily life. She read the newspaper which Simmon brought to her and would discuss news items with Simmon. Essentially, he was her conduit with the outside world, as she remained at home except when he took her out.

Battiste and Simmon shared a relationship of trust and confidence. It is uncontroverted that Battiste relied upon Simmon to conduct her personal and business affairs and to direct her daily spiritual upliftment. In conclusion, Simmon was her spokesperson, advisor and de facto guardian. Of significant importance is the Appellate Court's words in *Joseph v. Eastman*, 344 F.2d 912 (3rd Cir. 1965) which states:

"where donor of a gift is aged and physically infirm and a relationship of trust and confidence existed between donor and [the] donee, the gift is presumed to have been induced by fraud or undue influence, and the burden shifts to the donee to show affirmatively and by clear and convincing proof that no deception was practiced, no undue influence was used, and that all was fair, open, voluntary and well understood."

The Court further said that

"where there was very close relationship between grantor and grantee [and] grantor was dependent upon grantee for care and personal attention, and grantor had no outside or independent advise as to effect of conveyance of her undivided interest in realty owned by grantor and her husband, the trial court did not

85

err in holding that presumption of undue influence on part of grantee arose."

Importantly, in *Francois v. Francois*, 599 F.2d 1286, 1292, 16 V.I. 130 (3rd Cir. 1979), the Court said:

"Undue influence is not a concept susceptible of unitary definition. The essence of the idea is the subversion of another person's free will in order to obtain assent to an agreement.

If a party in whom another reposes confidence misuses that confidence to gain his own advantage while the other had been made to feel that the party in question will not act against his welfare, the transaction is the result of undue influence. The influence must be such that the victim acts in a way contrary to his own best interest and thus in a fashion in which he would not have operated but for the undue influence.

Williston on Contracts, Section 1625 at 776-77 (3d ed. 1970) (footnotes omitted). The degree of persuasion that is necessary to constitute undue influence varies from case to case. The proper inquiry is not just whether persuasion induced the transaction but whether the result was produced by the domination of the will of the victim by the person exerting undue influence. Restatement of contracts Section 497, Comment c. Hence, the particular transaction must be scrutinized to determine if the agreement was truly the product of a free and independent mind. In this respect the fairness of the agreement must be shown by clear and convincing evidence."

Moreover, what Simmon did or did not do concerning the obeah scenario is not as important as what Battiste believed he did for her or what she believed he was doing in order to protect her. Importantly, Battiste spoke of the obeah scenario at a time when she was lucid and suffered no psychological malady or mental infirmity. Had Battiste spoken generally about obeah her assertions would be suspect. However, the detailing of the obeah activities lends credence to her account of these events.

What did Battiste and Simmon discuss about Battiste's affairs? Undeniably, Simmon had an uninhibited opportunity to influence

Battiste, and in her he found a most receptive recipient to his ideas and advice.

Was there an opportunity over the years for Simmon to influence Battiste? The answer is a resounding yes.

Interestingly, during his testimony, Simmon was asked by the Court why he did so much for Battiste. His response was simply "I like to help people. Helping people is my mission." This philosophy is admirable, laudable and commendable. Yet, no evidence was adduced which substantiates Simmon's assertions or confirms his human altruism towards others. There is absolutely no evidence that Simmon had ever offered the same level of assistance to any of his close friends or relatives, by blood or by marriage, as he did for Battiste. Further, as a church deacon, there is no evidence that Simmon offered any assistance to his church brothers and sisters that rival or came remotely close to the level of assistance he readily and willingly offered Battiste. Lastly, no evidence was elicited or adduced to demonstrate Simmon's altruistic and humanitary propensities, other than that which he demonstrated towards Battiste. Considering that Simmon was gainfully employed with the Territorial Government, and being mindful of the time he afforded Battiste, and the time he spent with his immediate family, it is highly unlikely that he had time to be altruistic towards others on a comparable basis.

The Court finds that Battiste was not a strong-willed person, and she allowed Simmon to operate and conduct her affairs on a daily basis. Simmon was Battiste's protector from obeah, he afforded her spiritual upliftment by praying daily with her, he handled her personal and financial affairs, he made certain she received her daily meals, and whenever her children called on the phone, Battiste was always hesitant in her conversation when Simmon was at her home. Simmon took Battiste to her doctor's appointments. The Court finds that Battiste use of the reference "We" when she decided to do anything or make a decision about something was an obvious reference to her and Simmon acting in concert and not the decisions of an independent mind.

Is it mere happenstance that the same real properties which Battiste believed anonymous persons wanted to take from her by means of obeah, she would eventually convey to Simmons and his

87

wife or devise to him in her Last Will and Testament, to the exclusion of her children? Ironically, Simmon, the protector and savior of the properties would now become the new owner. Therefore, the presumption of undue influence is established. *Gautier v. Gonzales-Latimar*, 25 V.I. 26 (Terr. Ct. Div. St. Croix, 1990).

The estrangement by Battiste from her children offers no plausible justification. For example, for years the children were not residing in the Virgin Islands; therefore, communication between mother and children had to be done by telephone and letters. Yet, the children did nothing which the Court could find that would warrant Battiste believing that they no longer cared for her or loved her.

Why Battiste believed that she would be relocated to a nursing home escapes the Court. The only persons who could endeavor to do so would be her children. But, these same children built for Battiste a superior masonry structure adjacent to the one in which she resided. Whenever Battiste stepped outside her home, she couldn't avoid seeing the "new" house which would have allowed her to remain in the neighborhood and to continue to enjoy her familiar surroundings. Yet, Battiste refused to move to the new house. For someone who was in complete command of her mental faculties, and who did not suffer from any mental illness or disorder, what or who would have led her to believe in the nursing home relocation is not much of a mystery.

■ The Court finds that Simmon doing chores for Battiste such as preparing Battiste's meal when she could have done so herself, could have only enhanced his "sphere of influence" over Battiste and caused her to become unnecessarily dependent upon him.

■ Additionally, considering Battiste's belief in obeah, and what she believed about things in her yard, and further considering her understanding of Simmon's ability to successfully dispose of and cure one of her greatest fears, the Court finds that these matters bolstered Simmon's ability to influence Battiste. Whether Simmon ever participated in obeah activities is not important. What is important was Battiste's perception that Simmon rescued her from the scourges of obeah and for which she was grateful, thereby further influencing Battiste to give him the properties.

88

■ Considering the relationship between Battiste and her children, at least up to the end of 1985, there appears no cogent reason why she would want, of her own volition, to disinherit them as to all her properties, real and personal. Understandably, for his loyalty and assistance, it is foreseeable that Battiste would desire that Simmon have a part or portion of her estate or a part of her real properties. But, for Battiste to convey or devise to Simmon all her real properties, except the one she years earlier had conveyed to her daughter, and leave all her worldly possessions and properties for Simmon while disinheriting her family are irreconcilable and incongruous with the evidence in the case. Both Simmon and the children contributed to Battiste's welfare, but in different ways and for which she was aware.

Battiste's kindness and appreciation for what they all did for her would extend to both plaintiffs and defendant, even if in different degrees.

The Court finds that considering the evidence and totality of circumstances in this case, defendants have not rebutted the presumption of undue influence. Accordingly, the following deeds will be set aside:

A. The September 30, 1985 deed executed by Ada Battiste conveying to Aristle Simmon and Olivia Simmon Parcels No. 6M-E and 6Y-D Estate Thomas, No. 6 New Quarter, St. Thomas Virgin Islands; and

B. The October 28, 1987, deed executed by Ada Battiste, conveying to Aristotle Simmon Parcel No. 6D-3 Estate Thomas, No. 6M New Quarter, St. Thomas, Virgin Islands

## JUDGMENT

Pursuant to the Court's May 23, 1996 Memorandum Opinion in the above captioned case and the reasons and findings of facts enumerated in that Memorandum Opinion, it is hereby

ORDERED AND ADJUDGED that the September 30, 1985 deed executed by Ada Battiste conveying to Aristide Simmon Parcels No. 6M-E and 6Y-D Estate Thomas, No. 6 New Quarter, St. Thomas, Virgin Islands and the October 28, 1987 deed executed by Ada Battiste conveying Parcel No. 6D-3 Estate Thomas No. 6 M

New Quarter, St. Thomas, Virgin Islands are set aside, cancelled and are declared null and void; and it is further

ORDERED that a copy of this Judgment be recorded in the Office of the Recorder of Deeds, St. Thomas-St. John, Judicial District on the record of both properties, and it is further

ORDERED that copies of this Judgment shall be directed to the parties' attorneys; and a copy served on the Recorder of Deeds at the Office of the Recorder of Deeds in the St. Thomas-St. John Judicial District.