[No. 16163-3-III. Division Three. June 30, 1998.]

*In the Matter of the Estate of* MURRAY M. LINDSAY.

MYRTLE LINDSAY, *Respondent,* v. CATHY R. LINDSAY, *Appellant.*

946

*Kenneth D. Beckley,* for appellant.

*Howard N. Schwartz* of *Dauber, Bartheld & Schwartz,* for respondent.

SWEENEY, J. — This will contest presents two questions. First, did the court correctly conclude that the attestation of a handwritten will met the requirements of RCW 11.20.020?[1] And, second, did a written separation agreement effectively waive the wife's right to a homestead allowance under former RCW 11.52.010? The trial court's conclusion that the statutory requirements for attesting to a will were met is amply supported by its factual findings. And so is its conclusion that the surviving spouse effectively waived her right to a homestead allowance by signing a

---

[1]A will must be attested by two witnesses subscribing their names in the presence of the testator.

separation agreement. We therefore affirm the judgment admitting the will to probate and denying the award in lieu of homestead.

## FACTS

Murray and Cathy Lindsay married on December 1, 1983. On December 30, 1987, they executed reciprocal wills.

On October 1, 1991, the Lindsays signed a separation agreement dividing their real and personal property. They agreed that any reconciliation or changes to the agreement needed to be in writing. And they relinquished any claim to the other's property acquired after October 1, 1991.

For five months after the separation agreement, Cathy lived in Murray's house. After that, she moved into an apartment where she lived for two years. In April 1994, Cathy moved into Murray's house again for two months before moving to California. She lived in California for four months and then moved back to Ellensburg to live with her mother. In December 1994, Cathy and her mother moved to Bullhead City, Arizona. Later, Murray moved to Phoenix, Arizona, to attend school. Cathy and Murray regularly saw each other, talked and continued a sexual relationship.

But on August 22, 1992, Murray executed a new will. It revoked his previous will of December 30, 1987, and left everything to his mother, Myrtle Lindsay, and nothing to Cathy. The will was handwritten and attested by Doug O'Neil and Jeff Clark; both signed the will in Murray's presence. After the separation agreement, Cathy also executed a will excluding Murray as a beneficiary.

On November 30, 1995, Murray died in a motorcycle accident in Arizona. On January 8, 1996, Cathy petitioned to admit the December 1987 will to probate. On January 18, 1996, Myrtle Lindsay petitioned to set aside the 1987 will, remove Cathy as personal representative and admit the 1992 will. In response, and in the alternative, Cathy applied for an award in lieu of homestead if the trial court admitted the 1992 will.

At trial, Jeff Clark could not recall whether Murray signed his will in the presence of the witnesses. Both attesting witnesses filed affidavits, and testified, that Murray had specifically asked them to witness his last will and testament. Cathy argued that the will was invalid because it was not properly attested. The court admitted the 1992 will and denied the homestead allowance. It found that the parties had renounced their marriage and thereby effectively waived any right to a surviving spouse's award in lieu of homestead.

## DISCUSSION

Validity of Will. Cathy contends that the handwritten will is invalid because the attesting witnesses must show personal knowledge of a testator's signature and Jeff Clark could not recall whether Murray signed the document in his presence.

The requirements for execution of a will are minimal. *In re Estate of Price*, 73 Wn. App. 745, 751, 871 P.2d 1079 (1994) (citing *In re Estate of Chambers*, 187 Wash. 417, 425, 60 P.2d 41 (1936)). The will must be in writing, signed by the testator, and "shall be attested by two or more competent witnesses, by subscribing their names to the will, or by signing an affidavit that complies with RCW 11.20.020(2), while in the presence of the testator and at the testator's direction or request . . . ." RCW 11.12.020(1); *Price*, 73 Wn. App. at 751.

■■ A witness is one who has personal knowledge that the will was signed by the testator. *Id.* (citing *In re Estate of Cronquist*, 45 Wn.2d 344, 345, 274 P.2d 585 (1954)). But RCW 11.12.020 does not require that the testator sign the will in the presence of the witnesses, nor does it require that the witnesses sign in the presence of each other. *In re Estate of Gardner*, 69 Wn.2d 229, 236, 417 P.2d 948 (1966); *Chambers*, 187 Wash. at 425; *In re Estate of Ricketts*, 54 Wn. App. 221, 225, 773 P.2d 93 (1989). The witnesses need only subscribe their names in the presence of the testator

and at his direction or request. *Ricketts*, 54 Wn. App. at 225. Formal words of attestation are not required if competent witnesses testify that they subscribed their names to a document, in the presence of the testator, and testify to facts that amount in law to an attestation. *Price*, 73 Wn. App. at 751-52.

■ The court's findings that these minimum statutory requirements were met is amply supported by the affidavits and testimony of Doug O'Neil and Jeff Clark. They reflect that Murray asked both to witness his handwritten will. Both signed the original will as witnesses in the presence and at the direction of Murray. That is all the statute requires. RCW 11.12.020. Murray told them that the document was his last will and testament. They therefore had the required personal knowledge. *Cronquist*, 45 Wn.2d at 345.

Cathy's reliance on *Cronquist* is misplaced. In *Cronquist*, the court found the will was not properly attested. But there *not only* did the witnesses not see the testator sign, there was also *no* other evidence of acknowledgment by the testator that the document was his signed will. *Id*. Here, the evidence is Murray told the witnesses that he had signed the will.

The trial court properly concluded the will was validly executed.

Homestead Allowance. Cathy next contends the evidence does not support the court's finding that she and Murray renounced their marriage. The court's conclusion that she effectively waived her statutory right to the surviving spouse's homestead allowance must then also fail.

A testator has the right to intentionally disinherit a surviving spouse. *In re Estate of Deoneseus*, 76 Wn. App. 656, 658-59, 886 P.2d 1155, *aff'd*, 128 Wn.2d 317, 906 P.2d 922 (1995); *see also In re Estate of Burmeister*, 124 Wn.2d 282, 287, 877 P.2d 195 (1994). But disinheriting a surviving spouse does not deprive a spouse of a homestead allowance. If "no homestead has been claimed in the manner provided by law . . . then the court . . . shall award and set off to

the surviving spouse, if any, property of the estate, either community or separate, not exceeding the value of thirty thousand dollars at the time of death . . . ." Former RCW 11.52.010;[2] *In re Estate of Overmire*, 58 Wn. App. 531, 533, 794 P.2d 518 (1990).

Homestead allowance is absolute and a high priority in Washington. *In re Estate of Boston*, 80 Wn.2d 70, 75, 491 P.2d 1033 (1971) (citing *In re Estate of Welch*, 200 Wash. 686, 94 P.2d 758 (1939)); *In re Estate of Buhakka*, 4 Wn. App. 601, 603, 484 P.2d 463, *review denied*, 79 Wn.2d 1005 (1971). The award is mandatory provided the surviving spouse "complies with all the conditions contained in the statutes authorizing the grant." *In re Estate of Pesterkoff*, 37 Wn. App. 418, 421, 680 P.2d 1062 (1984); *Chesnin v. Fischler*, 43 Wn. App. 360, 365, 717 P.2d 298 (1986). The fact that granting an award in lieu of homestead may interfere with the testamentary plan of a decedent is not a reason to reduce or deny the award. *In re Estate of Dillon*, 12 Wn. App. 804, 806, 532 P.2d 1189 (1975).

■ But a surviving spouse may waive the right to a homestead allowance by express writing or conduct that renounces or abandons the right. *Boston*, 80 Wn.2d at 75; *In re Estate of Osicka*, 1 Wn. App. 277, 283-84, 461 P.2d 585 (1969); *In re Estate of Funderburk*, 10 Wn. App. 863, 864-68, 521 P.2d 60 (1974); *In re Estate of Nikiporez*, 19 Wn. App. 231, 236-37, 574 P.2d 1204, *review denied*, 90 Wn.2d 1013 (1978).

■ "[W]aiver is the intentional and voluntary relinquishment of a known right, or such conduct as warrants an inference of the relinquishment of such right." *Peste v. Peste*, 1 Wn. App. 19, 24, 459 P.2d 70 (1969) (quoting *Bowman v. Webster*, 44 Wn.2d 667, 669, 269 P.2d 960 (1954)); *Mid-Town Ltd. Partnership v. Preston*, 69 Wn. App. 227, 233, 848 P.2d 1268, *review denied*, 122 Wn.2d 1006 (1993). Or waiver may follow an express agreement or be inferred

---

[2]RCW 11.52.010 granting an award in lieu of homestead to a surviving spouse was repealed by LAWS OF 1997, ch. 252, § 87, effective July 27, 1997.

from circumstances. *Peste*, 1 Wn. App. at 24 (quoting *Bowman*, 44 Wn.2d at 669). "It is a voluntary act which implies a choice, by the party, to dispense with something of value or to forego some advantage." *Id*.

 Cathy and Murray separated by a formal separation agreement. The validity and intent of the agreement is undisputed. Therefore, as of October 1, 1991, they were legally separated and their property divided. Their agreement was effective immediately and not contingent on a divorce proceeding. They agreed "that neither has a claim or interest in anything acquired after the date of October 1, 1991 or anytime in the future." It was further agreed that "should reconciliation be made between the two parties in the future, and/or any changes in the wording or agreements need altered, it must be in writing and signed in agreement by both parties."

The agreement clearly reflects an intent to give up those rights which would normally follow legal spouses. And when "ascertaining the intention of parties to a written agreement, we must look to the wording of the instrument itself as made by the parties, view it as a whole, and consider all of the circumstances surrounding the transaction, including the subject matter together with the subsequent acts of the parties to the instrument." *In re Estate of Garrity*, 22 Wn.2d 391, 398, 156 P.2d 217 (1945); *In re Estate of Brown*, 28 Wn.2d 436, 440, 183 P.2d 768 (1947).

Cathy contends she is entitled to a homestead allowance since the separation agreement did not specifically waive that right. She is mistaken; implied waiver is enough. "The test is whether the parties through their actions have exhibited a decision to renounce the community 'with no intention of ever resuming the marital relationship.' " *Parrish v. Jones*, 44 Wn. App. 449, 456-57, 722 P.2d 878 (1986) (quoting *Peters v. Skalman*, 27 Wn. App. 247, 252, 617 P.2d 448, *review denied*, 94 Wn.2d 1025 (1980)). Intent to reconcile the marriage is a question of fact. *Parrish*, 44 Wn. App. at 458.

Here, the court's conclusion that this marriage was defunct is amply supported by the record. *Kunkel v. Meridian Oil, Inc.*, 114 Wn.2d 896, 903, 792 P.2d 1254 (1990). By the separation agreement, they divided all property and waived all claims to the other's property. The agreement was never rescinded, revoked, or altered. Both executed wills leaving nothing to the other. And between October 1, 1991, and Murray's death on November 30, 1995, they did not live together, except for brief temporary periods.

Cathy argues that she and Murray intended to live together in Arizona when he finished school and this shows the marriage was not defunct. *Parrish*, 44 Wn. App. at 456-57 (quoting *Peters*, 27 Wn. App. at 252). Carolyn Hallopeter testified that Murray planned to accept a job in Snoqualmie after he finished school and move in with her. The court's finding to the contrary is therefore supported.

Their actions showed an intent to prevent, waive, and abandon what a surviving spouse could normally take. Cathy effectively renounced the marriage and waived the statutory homestead allowance.

The judgment of the trial court is affirmed.

BROWN and KATO, JJ., concur.

Review denied at 137 Wn.2d 1004 (1999).