IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| JOSEPH MICHAEL ZAJAC, | ) | No. 79938-0-I |
| | ) | |
| Appellant, | ) | DIVISION ONE |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| SUSAN PIKE ZAJAC, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

HAZELRIGG, J. — Joseph Zajac seeks reversal of final orders concerning the division of property in a dissolution action. He alleges that the fragmented trial violated his due process rights, disputes the trial court's characterization and valuation of various assets, and argues that the court erred in awarding attorney fees to his former spouse, Susan Pike, based on his intransigence. Because he has not shown that the trial schedule was a manifest error affecting his constitutional rights, we decline to review this issue for the first time on appeal. Substantial evidence supports the trial court's factual findings, and the court did not abuse its discretion to execute a just and equitable division of property and award Pike attorney fees incurred because of Zajac's intransigence. We affirm.

FACTS

Joseph Zajac and Susan Pike (formerly Susan Zajac) married in 1980. They have four adult children, three of whom are triplets. The couple moved to

Seattle because Zajac took a job with Boeing. Since the early 1990s, he has been self-employed as a trader of futures and options. In addition to his trading, Zajac started a mead-brewing and distribution business called BeeHaven Beverage in 2011. For most of the marriage, Pike worked in the healthcare field as a nurse and as an infection control and epidemiology professional. She stopped working in October 2014 due to extreme pain from a degenerative spinal disease.

Zajac and Pike separated on September 29, 2017 and began divorce proceedings. Temporary orders were entered on October 16, 2017 allowing Zajac to continue to invest and trade in their RJ O'Brien (RJO) investment account and pull cash from the account for his monthly expenses, provided that he give Pike updates on and access to the account. Amended orders entered on December 1, 2017 allowed his trading to "continue as it has in the past[,] which serves to maintain the status quo."

On September 29, 2017, the date of separation, the combined net liquidated value of the RJO accounts was $885,163. The accounts decreased in value somewhat during the rest of 2017, ending the year with a net liquidated value of $742,095. From November 30, 2017 to January 23, 2018, RJO notified Zajac twelve times that his investment position exceeded RJO's risk requirements. Zajac did not appear to take any significant action to reduce his risk in response to these notifications and at one point increased his exposure. In late January, RJO notified Zajac that they would be doubling his margin requirement in response to his risky position. Zajac cut and pasted Pike's electronic signature to authorize moving the funds to another brokerage firm, Straits Financial, which had more lenient risk

policies and margin requirements. On January 31, 2018, the combined net liquidated value of the accounts was $515,456 after a market loss of $211,639 in one month. On February 5, 2018, the accounts lost 133.64 percent of their net liquidated value, extinguishing the value entirely and putting the parties in debt to Straits.

In the spring of 2018, Zajac and Pike sold the marital home on Mercer Island and agreed to deposit the net sale proceeds of $2,402,203.59 into a blocked account. On May 21, 2018, the parties stipulated and agreed to the disbursal of funds from the blocked account as follows:

1. Cashier Check made payable to Susan Zajac in the sum of $20,000;
2. Cashier Check made payable to Janet L. Comin in the sum of $42,798.14;
3. Cashier Check made payable to Joseph Zajac in the sum of $20,000;
4. Cashier Check made payable to Philip Shucklin in the sum of $30,000[.]

They stipulated that the $20,000 distributed to each of them should be considered a pre-distribution of community assets and the money paid to their attorneys was paid from community assets.

On August 28, 2018, the parties entered into a second stipulation and agreed order regarding the sale proceeds of the Mercer Island home. They agreed that they should each "receive $75,000 from the blocked Chase account as a predistribution [sic] of community assets to be charged against the parties in the final division of property in this divorce." The distributions were to be in the form of a "$75,000 cashier's check payable to Janet L. Comin for the benefit of Susan Zajac," and a "$75,000 cashier's check payable to Joseph Zajac."

The trial focused on the division of assets between the parties. It took place over seven days scattered throughout approximately one month due to scheduling conflicts between the parties and the court.

Pike testified that Zajac had purchased a condominium in Seattle without Pike's involvement in 2011. He told her that it would be a good investment property to rent out. When Pike inquired about the condo occasionally, Zajac told her that it was rented to a couple who were paying $1,500 per month in rent. In September 2017, Pike began to suspect that Zajac was not being honest with her and asked to see records of the rent payments. He showed her a document that "was clearly a fake bank statement." Pike then combed through all of their bank accounts dating back to 2011 and found no sign of any rental income from the condo.

Allison Cyr testified that she lived in the Zajac's Seattle townhome from early 2012 until November 2017. She met Zajac in 2011 when she responded to an ad that he placed about starting a meadery. Zajac paid Cyr a salary of $1,500 per month for her work at BeeHaven and allowed her to live in the townhouse rent-free. Cyr did not receive paychecks; the money was transferred directly into her account. She never received a W-2 or 1099 while working at BeeHaven and did not file a federal tax return for the monies received from BeeHaven or rent in lieu of wages. Cyr and Zajac ran BeeHaven out of the townhome until early 2015, when they moved the business into a Tukwila warehouse. Cyr understood her informal agreement with Zajac to be that the "sweat equity" that she put into the business would give her ownership of BeeHaven and Zajac would eventually turn

the business over to her. She also admitted that they had an occasional sexual relationship.

Zajac testified that BeeHaven might have made a small profit one year, but it otherwise operated at a loss. He also testified that he did not believe his trading at RJO to be particularly risky and thought RJO issued the warnings primarily because of his withdrawals from the account and RJO's assessment of its own risk. Zajac believed he was justified in using Pike's signature when moving the brokerage account funds because he had power of attorney. In early February, after the move to Straits, he tried to place "stop orders" in response to higher market volatility that would have mitigated some of the risk, but the orders were rejected by Straits' online system.

The court also heard testimony from Kerry Campbell, an expert in risk management, financial market analysis, trading analysis, investment and securities analysis, investment liability and damages, financial planning, and fiduciary duty analysis in investing. Campbell testified regarding losses sustained by Zajac and Pike's brokerage accounts after their separation. He analyzed account statements from the parties' RJO investment accounts, RJO risk reports, transcripts of Zajac's phone conversations with RJO, account statements from the parties' Straits Financial investment accounts, Zajac's phone conversations with Straits, and Zajac's deposition.

Campbell testified that trading in futures is inherently very risky. He opined that Zajac's management of the accounts from September 29, 2017 through the end of February 2018 was "imprudent fiscally" and carried risk that was excessive

for people in their 60s. He also characterized Zajac's decision to move to Straits without familiarizing himself with the trading platform and after being warned by RJO of the excessive risk was "reckless" and constituted "gross negligence" and "a breach of his fiduciary duty." He stated that Zajac's trading strategy was irrelevant to these conclusions because the documents showed "that the accounts had tremendous risk[,] that they were losing money consistently the entire period of time[,] and then had a catastrophic loss in the February period."

The court entered extensive findings of fact and conclusions of law. The court found that Zajac "was generally not a credible witness" and that Cyr's testimony also "lacked credibility in many respects." These credibility findings preceded comments about the court's characterization of BeeHaven:

> Mr. Zajac's testimony regarding his failure to maintain accounting records and to pay employment taxes either evidences that BeeHaven was no more than a hobby in[to] which he poured a huge amount of community assets [ ] without regard for the community or that he was willing to ignore his legal obligations with respect to filing taxes year after year. The Court, after reviewing the monetary investment into BeeHaven and its profits over the years, characterizes BeeHaven as a hobby; nonetheless, Mr. Zajac had obligations with respect to employment tax that he failed to shoulder. This failure—and his claimed ignorance—is surprising given that Mr. Zajac has a Master[s] in Business Administration.

Relatedly, the court found Cyr "credible when she testified that she did some work for BeeHaven," but did not credit the testimony that she worked full-time. The court found it reasonable that Cyr was compensated $1,500 per month for her part-time work at BeeHaven but found the additional compensation in the form of free rent at the Seattle townhouse unreasonable.

The court did not find Zajac's testimony regarding his management of the brokerage account credible. However, the court found Campbell, Pike's expert witness, "well-qualified and credible." The court found that Zajac's trading practice carried "tremendous inherent risk," which he failed to mitigate. The court found his conduct "reckless, grossly negligent, fiscally imprudent, and a violation of his fiduciary duties to the community and to the Trust." The court also found that Zajac's conduct in falsifying Pike's signature on the documents approving the transfer of funds from RJO to Straits was a direct cause of the community's losses. The court ascribed sole responsibility to Zajac for the community's $932,981 loss. Zajac's conduct was made "a more egregious form of recklessness and imprudence" due to the parties' age and nearness to retirement.

The court also found that the forgone rental income for the Seattle condo should be treated as a pre-distribution of community funds to Zajac because he allowed Cyr to live in the property rent-free despite knowing that this arrangement would not benefit the marital community and he deceived Pike about the rent. The court credited the testimony of Pike's expert in the valuation of real estate and found that the fair rental value of the townhouse since 2012 was $103,500.

The court found that Zajac "should pay $141,316.75 of the fees and costs [Pike] has incurred through December 31, 2018" because of his intransigence in the proceeding and violations of temporary orders. The court stated that it had reviewed the affidavit of counsel and found that the type of work and hourly wage reported were fair and reasonable.

The court ordered a nearly equal division of property between the parties. Zajac appealed.

ANALYSIS

I.    Due Process

Zajac first argues that the "disjointed and truncated presentation of witnesses at trial, as dictated by counsel and the court's schedule on other matters, violated the Fourteenth Amendment's guarantee of due process." He acknowledges that he did not object to the shortened time to present witnesses at trial but argues that he may raise this issue for the first time on appeal because it was a manifest error affecting a constitutional right. See RAP 2.5(a). We review constitutional arguments de novo. In re Welfare of A.W., 182 Wn.2d 689, 701, 344 P.3d 1186 (2015).

Manifest errors affecting a constitutional right may be raised for the first time on appeal provided that the record is adequate to permit review. RAP 2.5(a); In re Marriage of Akon, 160 Wn. App. 48, 59, 248 P.3d 94 (2011). To show that an error is "manifest"—that is, truly of constitutional magnitude—an appellant must show how the alleged error actually affected the appellant's rights in the context of the trial. State v. McFarland, 127 Wn.2d 322, 333, 899 P.2d 1251 (1995). This showing of actual prejudice allows for appellate review. Id.

Zajac does not identify any additional evidence that he would have offered had his trial presentation not been cut short. Instead, he argues that "error arises not from the quality or quantity of the evidence excluded, but the lack of opportunity to present the evidence at all when one has a right to do so," citing Smith v. Fourre,

71 Wn. App. 304, 308–09, 858 P.2d 276 (1993). In Smith, the defendant moved for a directed verdict after the second day of trial even though the plaintiff had not yet presented the entirety of her case in chief. Id. at 306. The trial judge granted the motion and dismissed the case over Smith's objection that she had not rested. Id. Division Two of this court reversed, stating that "every litigant is entitled to be heard before his or her case is dismissed" and therefore "a plaintiff must be given the opportunity to present not just part, but all, of his or her evidence before the trial court rules on the sufficiency of that evidence." Id. at 306–07.

Unlike Smith, Zajac did not raise an objection to any abbreviation of his presentation of evidence in the trial court. Neither did Zajac ever indicate to the court that he had additional evidence to present. Smith does not excuse Zajac from making a showing of actual prejudice to allow for our review. Because he has not done so, we decline to consider this alleged error raised for the first time on appeal.

II.    Property Distribution

In a dissolution action, the trial court is required by statute to divide the property and liabilities of divorcing parties "as shall appear just and equitable after considering all relevant factors" but without regard for misconduct. RCW 26.09.080. Relevant factors include, but are not limited to, the nature and extent of community and separate property, the duration of the marriage, and the economic circumstances of each spouse at the time the division of property is to become effective. Id.

The trial court has broad discretion to determine what constitutes a just and equitable division of property. In re Marriage of Larson & Calhoun, 178 Wn. App. 133, 138, 313 P.3d 1228 (2013). The court is not required to distribute the property equally but rather to make a fair division based on "a consideration of all the circumstances of the marriage, both past and present, and an evaluation of the future needs of parties." Id. (internal quotation marks omitted) (quoting In re Marriage of Crosetto, 82 Wn. App. 545, 556, 918 P.2d 954 (1996)). "The trial court is in the best position to decide issues of fairness." Id. Therefore, a property division entered in a dissolution action will be reversed only if there is a manifest abuse of discretion. In re Marriage of Rockwell, 141 Wn. App. 235, 242–43, 170 P.3d 572 (2007). The court abuses its discretion when the decision is manifestly unreasonable or based on untenable grounds or reasons. In re Marriage of Muhammad, 153 Wn.2d 795, 803, 108 P.3d 779 (2005).

Factual issues will not be retried on appeal. In re Marriage of Thomas, 63 Wn. App. 658, 660, 821 P.2d 1227 (1991). We accept the trial court's factual findings as true provided they are supported by substantial evidence in the record. Id. Substantial evidence is a quantum of evidence sufficient to persuade a reasonable person that the premise is true. Wenatchee Sportsmen Ass'n v. Chelan County, 141 Wn.2d 169, 176, 4 P.3d 123 (2000). The court's credibility findings are not subject to review. DewBerry v. George, 115 Wn. App. 351, 362, 62 P.3d 525 (2003).

A. Forgone Rental Income

Zajac argues that the court abused its discretion in treating the forgone rental income from the Seattle townhouse as a pre-distribution to Zajac in the amount of $103,500. He contends that the trial court "ignored the true nature of the property" and that it was, "at all pertinent times, used for [BeeHaven] purposes."

Either spouse may manage and control community property. RCW 26.16.030. "A disposition of community funds is within the scope of authority of the acting spouse so long as he or she is acting 'in the community interest.'" Schweitzer v. Schweitzer, 81 Wn. App. 589, 597, 915 P.2d 575 (1996) (quoting Hanley v. Most, 9 Wn.2d 429, 461, 115 P.2d 933 (1941)).

The court found it appropriate to treat the forgone rental income as a pre-distribution to Zajac because he did not prove that he had a reasonable expectation that the community estate would receive a benefit from allowing Cyr to live there rent free and because he fraudulently deceived Pike in all respects regarding his management of this significant community asset. Substantial evidence supports these factual findings. Pike testified that Zajac represented the townhouse to her as an investment property from which they could collect rental income. He falsely informed her that the townhouse was rented and that the marital community was receiving rental income from the property. In fact, the townhouse was being used for the benefit of Cyr and of Zajac's hobby business, which, the record shows, was not profitable. The court did not abuse its discretion

in treating the forgone rental income as a pre-disposition of community property to Zajac.

B. Characterization of Assets

Zajac also contends that the trial court erred in characterizing several assets awarded to him.

1. $75,000 Pre-Distribution

Zajac argues that the trial court improperly characterized the $75,000 pre-distribution that he received from the sale proceeds of the Mercer Island home as community property and double-counted the funds when dividing the assets. Pike responds that the pre-distributions were accounted for by the court when it reduced the balance of attorney fees that Zajac owed to Pike.

The parties stipulated that the $75,000 payments disbursed to each of them from the blocked account should be treated as a pre-distribution of community assets. Pike's pre-distribution was paid directly to her attorney. Zajac testified that he deposited the $75,000 pre-distribution into his checking account. He also testified that he subsequently paid about $57,000 of attorney fees out of his checking account. Zajac requested that the court subtract the amount he had paid for attorney fees from its valuation of his Chase checking account. In the version of Pike's proposed property report that was discussed at length during the trial, the value of Zajac's Chase account is listed as $29,732 as of June 22, 2018. The proposed report contains a separate line item for the $75,000 pre-distribution to Zajac.

In Zajac's proposed property report submitted with his closing argument, he asked that the court find that his checking account had a balance of $51,710 on September 26, 2018. The comment next to this entry stated, "The 10/11/18 balance of $76,710 should be reduced by $25,000 per Joe's testimony re attorney's fees paid from this account prior to trial." Pike submitted a revised version of her proposed report, requesting that the court value Zajac's checking account at $84,174 as of September 26, 2018. Neither of the proposed reports listed Zajac's $75,000 pre-distribution as a separate item.

The court ordered that Zajac "should pay any and all attorney's fees and costs he has incurred over and above the amounts withdrawn from community assets for fees and costs pursuant to those temporary orders [entered on October 16, 2017 and December 1, 2017] and $30,000 paid to Philip Shucklin pursuant to the Stipulation and Order entered May 21, 2018." The property report initially entered by the court valued Zajac's checking account at $29,935 as of September 26, 2018 and characterized it as community property awarded to Zajac.

Pike moved for correction of errors, clarification, and/or reconsideration, requesting, among other things, that the valuation of Zajac's account be changed to $84,174 "in order to effectuate the Court's findings with respect to the husband's responsibility for payment of his own attorney's fees for trial." She argued that reducing the value of Zajac's checking account, into which he had deposited the $75,000 pre-distribution of community funds, resulted in the community indirectly paying his attorney fees. She also pointed out that the court's calculation of attorney fees owed to her treated the money she had already paid to her attorney,

including the $75,000 pre-distribution, as community funds and credited Zajac for half of this payment.

The court granted Pike's motion and found that "[t]he value of the Husband's Chase #9307 bank account balance should be changed from $29,935 as set forth in Exhibit A to $84,174, the balance that is consistent with the Court's [findings of fact]." The amended property report listed the value of Zajac's checking account as $84,174 and characterized it as community property awarded to Zajac. The amended property report entered by the court did not include a separate line item for the $75,000 pre-distribution to Zajac.

The parties stipulated that the pre-distributions would be considered as community property, and the record shows that the court treated the pre-distributions to both parties as community funds. Although Zajac states that the court double-counted his pre-distribution because "the pre-distribution was already included in Mr. Zajac's share of the marital assets," the court's order does not appear to include the pre-distribution anywhere other than Zajac's Chase account. Zajac has not demonstrated that the court erred in any respect.

### 2. BeeHaven's Assets

Zajac also argues that the trial court erred in its treatment of monies invested by Cyr in BeeHaven. He contends that, "by allocating the funds to Mr. Zajac alone, the court ignored the fact that the investments benefitted both Mr. Zajac and Respondent."

The court found that BeeHaven should be sold in an arm's length transaction rather than assigned a value that would be "too speculative." The court

found that there was evidence that Cyr had given Zajac a check for $12,000 but there was no evidence that the check had been deposited into any bank account. Therefore, the court concluded that the check was cashed rather than deposited and "that the cash exists but has not been accounted for by Mr. Zajac."  Zajac was awarded this $12,000 as part of BeeHaven's hard assets.

Zajac argues that, "[b]ecause these funds benefitted both parties, they must be treated as marital property and not counted against Mr. Zajac in any manner." Again, Zajac's argument does not reflect the court's findings.  The amended property report lists "Beehaven LLC – Equipment and Missing $12,000" as community property awarded to Zajac.  He has not demonstrated that the court erred.

Zajac argues in the alternative that the court erred in awarding him BeeHaven's assets without considering Cyr's role at BeeHaven.  The court found that BeeHaven had value as a going concern but explicitly declined to speculate as to the value of intangibles such as "the expected continued patronage of its customer, the proprietary recipes for the mead, and the goodwill value associated with its brand and name."  It treated BeeHaven as community property, ordering it to be sold with any proceeds to be divided equally between the parties, and awarded Zajac its tangible assets: a checking account with a balance of $4,345 and the unaccounted-for $12,000 investment from Cyr.

Zajac contends that the court should have either subtracted back wages owed to Cyr as an employee or determined her ownership interest in BeeHaven "for the business to be properly valuated."  The court did not assign a value to

BeeHaven.  Presumably, its value will be determined by the sale.  Zajac has not demonstrated any error.

Zajac also contends that the court failed to treat the BeeHaven checking account as community property.  As recognized above, the court found the BeeHaven checking account to be community property and awarded the account to Zajac.  Zajac does not identify an error.

C. Valuation of Assets

Zajac argues that the court erred in several of its valuation decisions. Valuation decisions are questions of fact that we review for substantial evidence. In re Marriage of Hall, 103 Wn.2d 236, 246, 692 P.2d 175 (1984).

1.  The Brokerage Account

Zajac contends that the trial court erred in its valuation of the RJO account. He challenges the court's findings blaming his aggressive investment strategy for the account's losses.  Even if his investment plan was unwarranted, Zajac argues that the court should have considered which losses were caused by his strategy and which were caused by normal market fluctuations.

As noted above, the court determined that Zajac's testimony was not credible.  However, the court found Campbell, Pike's expert witness, "well-qualified and credible."  Based on Campbell's testimony, the court found that Zajac's actions and refusals to act regarding the brokerage account were the sole cause of the community's $932,981 loss.  The court found that Zajac's trading strategy carried "tremendous inherent risk" and Zajac ignored RJO's risk warnings, refused to de-

risk his positions, and dramatically increased risk by moving the brokerage accounts to a firm with more lenient risk requirements. The court specifically found that, "[w]hen a substantial percentage of an estate that took 40 years to accumulate can be lost in two or three days, and losses are of the magnitude sustained in this case, the positions in the portfolio are fiscally imprudent and have excessive risk."

These findings are all supported by Campbell's testimony and conclusion that the use of any investment strategy carrying this degree of risk for parties nearing retirement age was grossly negligent and reckless. Therefore, there is substantial evidence in the record for the findings. We do not review the court's credibility determinations or reweigh the evidence on appeal. Rockwell, 141 Wn. App. at 242.

### 2. Personal Property

Zajac also argues that the trial court improperly valued certain items of personal property. "An owner may testify as to the value of his property and the weight to be given to it is left to the trier of fact." Worthington v. Worthington, 73 Wn.2d 759, 763, 440 P.2d 478 (1968). When the parties present conflicting evidence of valuation, the court may adopt the value asserted by either party or any value between the two. Rockwell, 141 Wn. App. at 250.

He first contends that the court's finding about the value of BeeHaven's equipment was unsupported because "[n]o evidence was presented regarding the value of the business equipment." The value of BeeHaven's equipment was merged with the "missing $12,000" and valued at $12,000. There was substantial

evidence that Zajac had received the $12,000 check from Cyr. Therefore, the value assigned to BeeHaven's equipment was $0. Because no evidence of equipment value was presented, this valuation is supported by the record.

Zajac also objects to the valuation of a jet ski, a piano, and other personal property. Pike valued the jet ski at $7,000 in her proposed property report. Zajac testified that he had sold the jet ski for $4,900. In his proposed property report, he listed a value of $0, commenting that he had sold the jet ski but provided no documentation of net proceeds from the sale. The court adopted Pike's valuation of $7,000, finding that Zajac had possession or control of evidence that could have established the sales proceeds he received for the jet ski but failed to produce it at trial. Substantial evidence in the record supports this finding, and the court did not abuse its discretion in adopting the value asserted by Pike.

The court noted that it found both Zajac and Pike's testimony regarding the piano and other personal property that Zajac removed from the home only partially credible. Zajac valued the items at $0 in his proposed property report. Pike proposed a value of $5,000. The court valued the piano and other personal property at $2,500. This valuation is within the range supported by the record.

III.    Attorney Fees for Intransigence

Finally, Zajac argues that the trial court erred in awarding Pike her attorney fees as a sanction against him for intransigence. He contends that the court's failure to make specific findings supporting the award necessitates reversal.

A court may award attorney fees in a civil action if the award is authorized by statute, by agreement of the parties, or on a recognized equitable ground. In

re Marriage of Greenlee, 65 Wn. App. 703, 707, 829 P.2d 1120 (1992).  "[A]ttorney fees based on intransigence are an equitable remedy."  Mattson v. Mattson, 95 Wn. App. 592, 604, 976 P.2d 157 (1999).  Trial courts have broad discretion to fashion equitable remedies, and we review the court's decision to award attorney fees for an abuse of discretion.  Niemann v. Vaughn Cmty. Church, 154 Wn.2d 365, 374, 113 P.3d 463 (2005); Crosetto, 82 Wn. App. at 563.  Intransigence may be found when, for example, a party engages in "'foot-dragging' and 'obstruction,'" files repeated unnecessary motions, or simply makes the trial unduly difficult and increases legal costs by those actions.  Greenlee, 65 Wn. App. at 708 (quoting Eide v. Eide, 1 Wn. App. 440, 445, 462 P.2d 562 (1969)).

Zajac argues that attorney fees based on intransigence were not warranted because "[t]he court did not make any specific findings that Mr. Zajac hid assets, refused discovery requests, or engaged in any other bad behavior."  The trial court's findings of fact include a four-page section with the heading, "Attorney's Fees Awarded for Respondent's Intransigence and Violations of Court Orders."  This section contains a litany of findings detailing Zajac's "bad behavior" and the consequences to Pike:

> Mr. Zajac never informed Ms. Zajac of his massive losses in the brokerage accounts, and claimed her actions and those of her attorney were the cause of the losses. She had to subpoena, review, and analyze thousands of documents and emails, and many hours of audio recordings to uncover the truth. She had to retain a financial securities expert at a cost of more than $25,000 to review and analyze Mr. Zajac's options and futures trading activities and testify regarding the manner in which those activities caused over $932,000 in losses.
> . . . .
> The closing had to be delayed once and the home sale almost fell through because, until the 11th hour, Mr. Zajac refused to agree

to the establishment of a standard interest-bearing bank account into which escrow would deposit the sale proceeds. Ms. Zajac and her attorney spent many hours trying to get Mr. Zajac to simply sign closing papers, all of which was an unnecessary waste of time and effort, and, of course, a great deal of money was spent unnecessarily on attorney's fees.

The Court finds that discovery was also made unduly difficult by Mr. Zajac. To obtain answers to discovery requests, a Motion to Compel was filed. A judgment was entered against Mr. Zajac for $1,000 of those fees and costs, and he has refused to pay it.

Based on these and other findings, the court found and concluded that Zajac's conduct constituted intransigence that had caused Pike to incur substantial additional attorney fees. Each of the court's findings are supported by Pike's testimony. The court found Pike to be a largely credible witness. Substantial evidence supports the court's decision.

Zajac also contends that the court failed to determine "what, if any, portion of any alleged trial delay could be attributed to Mr. Zajac." An award of attorney fees based on intransigence is generally limited to the additional fees incurred because of the intransigence. See In re Marriage of Lilly, 75 Wn. App. 715, 720, 880 P.2d 40 (1994). "Where a party's bad acts permeate the entire proceedings, the court need not segregate which fees were incurred as a result of intransigence and which were not." Burrill v. Burrill, 113 Wn. App. 863, 873, 56 P.3d 993 (2002).

The record demonstrates that the court appropriately segregated the attorney fees. The court found that "a portion of the attorney's fees incurred by Petitioner as a result of the Respondent's intransigence and willful violation of the court's order should be paid by Respondent." The court found that Zajac should pay $141,316.75 of the reasonable fees and costs that Pike incurred as a result of Zajac's intransigence during the trial and violation of the temporary orders entered

on October 16, 2017 and December 1, 2017. The court did not abuse its discretion in awarding Pike attorney fees based on Zajac's intransigence.[1]

IV.    Attorney Fees and Costs on Appeal

Pike requests an award of her attorney fees and costs on appeal. She argues that she is entitled to an award of fees under RAP 18.1 and RCW 26.09.140, given her need and Zajac's ability to pay, and under RAP 18.9 "because this brief is frivolous and the appeal another instance of intransigence." In family law cases, courts may order a party to pay another party's reasonable attorney fees after considering the financial resources of both parties. RCW 26.09.140. We may also grant a party attorney fees on appeal if the appeal is frivolous. RAP 18.9(a). An appeal is frivolous if it presents no reasonably debatable issues and is so devoid of merit that no reasonable possibility of reversal exists. Greenlee, 65 Wn. App. at 710.

"Intransigence is a basis for awarding fees on appeal, separate from RCW 26.09.140 (financial need) or RAP 18.9 (frivolous appeals)." Mattson, 95 Wn. App. at 605-6. We need not consider the parties' financial resources when intransigence has been established. Id. "[A] party's intransigence in the trial court can also support an award of attorney fees on appeal." Id.

---

[1] Zajac also argues that the court erred in entering an attorney lien because he did not win a judgment in this case. Pike responds that this issue has no bearing on her and is not properly before this court because Zajac did not identify the lien as a subject of this appeal, attach a copy of the lien to the notice of appeal, or designate the documents pertinent to this issue. Generally, we review only the decision or parts of the decision designated in the notice of appeal. RAP 2.4(a). Because Zajac did not designate this decision for review in his notice of appeal and the record does not appear to contain the relevant decision, we decline to review this issue.

Zajac received two extensions totaling 90 days for filing his opening brief in this court. We indicated that no further extensions would be granted without sanctions being imposed. On the day the brief was due, Zajac's counsel withdrew and substitute counsel requested a 60-day extension to file the brief. Substitute counsel withdrew one day after filing the opening brief and Zajac's original counsel reappeared. Additionally, although Zajac's appeal is not entirely frivolous, a number of his arguments on appeal appear to be based on a misreading of the court's orders. In light of the trial court's extensive findings of intransigence below, these considerations support an award of attorney fees on appeal.

Affirmed.

WE CONCUR:

Andrus, A.C.J.                    Appelwick, J.